UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

In re Gilat Satellite Networks, Ltd.,

                           CV-02-1510 (CPS)

                           MEMORANDUM
                           OPINION AND ORDER

----------------------------------------X

SIFTON, Senior Judge.

Lead plaintiffs Leumi PIA Sector Fund, Leumi PIA World Fund, and Leumi PIA Export Fund commenced this consolidated class action complaint against defendants Gilat Satellite Networks, Ltd. ("Gilat"), Yoel Gat, and Yoav Leibovitch, alleging against all defendants violations of Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), and Rule 10b-5 promulgated under the Exchange Act, 17 C.F.R. § 240j.10b-5. The complaint also alleges against Gat and Leibovitch a violation of Section 20(a) of the Exchange Act. Presently before the Court is the defendants' motion pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the complaint and the plaintiffs' motion pursuant to Federal Rule of Civil Procedure 15(a) to amend the complaint.

For the reasons that follow, the motion to dismiss is granted in part and denied in part, and the plaintiffs are granted leave to amend the complaint.

## Background

The following facts are taken from the amended consolidated class action complaint.

Gilat is a provider of products and services for satellite-based communications products and services, including "Very Small Aperture Terminal" ("VSAT") satellite dishes. During all relevant periods, Yoel Gat was Gilat's Chief Executive Officer, and Yoav Leibovitch was Gilat's Chief Financial Officer.

In January 2000, Gilat formed a joint venture, Starband, with Microsoft and EchoStar Communications ("EchoStar"). MicroSoft and EchoStar each agreed to invest $50 million, while Gilat agreed to provide the necessary equipment. StarBand was formed to provide internet access via satellite dishes. Customers would purchase a VSAT manufactured by Gilat and then pay a monthly fee to receive internet access. Gilat owned 42.1% of the outstanding shares in the venture, and Gat was appointed StarBand's chairman. StarBand reportedly accounted for 25% of Gilat's annual revenue. The StarBand service was made available to the public in November 2000.

From 1997 to 2000, Gilat reported substantial growth in revenues and its stock rose dramatically. On February 28, 2000, Gilat stock traded at $160.50 a share. The complaint alleges, however, that the performance of Gilat's stock was driven not by actual results, but by deceptive financial statements that overstated Gilat's revenues. Although the defendants purported

to follow Generally Accepted Accounting Principles ("GAAP"),[1] they inflated reported revenues in press statements and SEC filings through premature revenue recognition, recording revenue from sales in excess of actual purchases, recognizing revenue from sales prior to delivering the product to customers, recognizing revenue from sales to uncreditworthy customers, recording goods placed on consignment as sold, and related-party transactions.

The complaint also alleges that the defendants misrepresented the performance of StarBand and the market for its services. The complaint alleges that the defendants announced, without any reasonable basis in fact, that users of StarBand could expect "internet access speeds up to 10 times faster than normal modem speeds" and "400 times higher than that of IDSN lines." (Complaint ¶¶ 72, 73, 97.) The complaint alleges, however, that StarBand did not provide the quality of internet access that the defendants' claimed. Beta testers and customers complained of the slow and unreliable service. Defendants also did not disclose that at the time the service was launched on November 6, 2000, StarBand was only able to supply an inferior modem that required more "satellite transponder resources" than anticipated. Nor was StarBand able to attract customers at the

---

[1] According to the complaint, "GAAP are those principles recognized by the SEC and the accounting profession as the conventions, rules, and procedures necessary to define proper accounting practice at a particular time." (¶ 192.) 17 C.F.R. § 210.4-01 states that financial statements filed with the SEC that are not in accordance with GAAP are presumed to be misleading or inaccurate.

rates defendants anticipated.

In order to assuage investor's fears regarding Gilat's cash flows, defendants announced that Gilat's total financial exposure in StarBand would not exceed $75 million. The defendants eventually exceeded this cap through secret "off the book floats" and "sham accounting."

As a result of StarBand's financial difficulties, in 2001 the venture needed an additional $250 million to $500 million in funding to stay afloat. The defendants determined to meet this goal through a public stock offering. For the offering to be a success, both Gilat and StarBand needed to appear to be financially strong.

On March 9, 2001, the defendants withdrew the proposed StarBand stock offering. The SEC Form RW cited "changed circumstances in the securities market" as the reason. The complaint alleges, however, that the offering was in fact withdrawn due to technical problems with the StarBand internet system and because EchoStar ceased marketing the product. On March 9, 2001, Gilat stock traded at $31.69 a share.

On March 12, 2001, defendants revised its revenue guidance for 2001, reducing projected revenues by $100 million. Defendants blamed "challenging economic conditions" for the revised guidance, but the true motivation was allegedly to account for the cumulative impact of Gilat's unorthodox accounting practices. (¶ 119.) The defendants also announced a "one-time" charge of $29.7 million purportedly resulting from

"acquisition related expenses and acquired in-process research and development" and for "impairment of investments in other companies." (¶ 118.) On March 12, 2001, Gilat stock traded at $13.94 a share.

On May 14, 2001, Gilat announced more unexpected expenses, this time an increase of bad-debt reserves by $20 million. That day Gilat's stock traded at $13.15 a share.

On July 11, 2001, the defendants announced that, in exchange for Gilat's relinquishing control of StarBand, EchoStar had agreed to invest an additional $50 million in the venture. The defendants did not disclose, however, that as part of the same transaction, StarBand's lenders reduced available credit by $37 million. The defendants also announced that Gilat would again incur one-time charges of $15 million to $18 million for "losses of associated companies," "expenses associated with the acceleration of long-term receivable payment," and "impairment of investments in other companies." (¶ 147.) Despite this announcement, Gilat's share price remained at $13.15 a share.

On August 6, 2001, EchoStar made an offer to purchase Hughes Electronics, one of Gilat's competitors in the VSAT market. When asked about the impact of the purchase on StarBand, Gat stated that EchoStar had committed to make this capacity available to StarBand. On November 12, 2001, the defendants admitted that although EchoStar had launched a satellite, it had yet to commit to making that capacity available to StarBand.

On October 2, 2001, Gilat announced that it would record a

$247 million charge for bad debt reserves, impairment of assets, inventory write off, and restructuring. This third charge, the complaint alleges, resulted in Gilat's share price closing at $3.32 a share, down 38% from the day before.

StarBand's difficulties began to become publicly apparent on April 5, 2002, when *The Wall Street Journal* reported that EchoStar was terminating its relationship with StarBand. On May 14, 2002, in a press release, Gilat announced that StarBand had been a failure, that Gilat's financial commitment to the venture exceeded $75 million, and confirmed that EchoStar had terminated its involvement in the venture.

On May 29, 2002, Gilat stated in its Form 20-F[2] filing with the SEC that its "doubtful account receivables" had increased from $3.654 million in 2000 to $134.614 million in 2001. On May 31, StarBand filed for bankruptcy. (¶ 22.)

In March 2002, nine complaints were filed against defendants asserting claims under Section 10(b) of the Exchange Act, and on July 22, 2001, the price of Gilat's stock fell below $1 a share. In October, 2002, Gilat filed for bankruptcy. On January 17, 2003, the Court consolidated these actions and appointed Leumi PIA Funds as lead plaintiffs. Lead plaintiffs filed a consolidated class action complaint on May 13, 2003. On August

---

[2] Form 20-F is the "SEC's basic disclosure document for foreign private issuers. Form 20-F is used to register a class of securities for trading in the United States and as an annual report form for companies that are subject to the SEC's periodic reporting requirements." Sandra Folsom Kinsey, *New Rules for Foreign Private Issuers*, INSIGHTS, Sept. 2000, at 9; *see also* 17 C.F.R. § 249.220f (describing the use of Form 20-F).

25, 2004, this amended consolidated class action complaint was filed.

The 154-page complaint relies on thirty-nine allegedly fraudulent statements. They fall into two categories: those pertaining to Gilat's accounting practices and revenue recognition, and those pertaining to the success of the StarBand joint venture. For the sake of clarity and completeness, those statements are listed here.

<u>StarBand Statements</u>

1) On February 9, 2000, Gat stated at the Merrill Lynch Satellite Services CEO Conference that "Gilat expects to have 1 [million] U.S. subscribers by 2003." (¶ 66.)

2) On February 16 and 23, 2000, Gilat issued press releases stating that StarBand users "could expect 'internet access speeds up to 10 times faster then (sic) normal modem speeds, with burst rates considerably higher.' " (¶¶ 69, 73.)

3) On February 20, 2000, a *Globes Online* article represented defendant's statement that "[StarBand] will offer subscribers Internet connectivity via satellite communications at a speed 400 times higher than that of IDSN lines. (¶ 71.)

4) On September 11, 2000, Gilat announced that StarBand customers "will have their first opportunity to enjoy an always-on, two-way, high-speed Internet experience . . . without the constraints of a cable or telephone wire." (¶ 97.)

5) On December 17, 2000, StarBand posted on its website that it was suspending the acceptance of advance orders due to the "overwhelming nationwide response for the StarBand High-Speed, Two-way, Internet service." (¶ 111.)

6) On March 12, 2001, Gilat stated in a press release that the initial public offering of StarBand stock was being withdrawn due to weak financial markets. (¶¶ 112-14.)

7) On March 12, 2001, in a conference call with

investors and securities analysts, Gat stated that "at
this point in time, we're expanding into new
distribution channels." (¶ 123.)

8) In the same March 12, 2001 conference call, Gat
stated that Gilat's financial exposure in the StarBand
investment "will be limited to $75 million." (¶ 123.)

9) On March 14, 2001, Leibovitch stated in an interview
with *Globes Online* that Gilat stood to lose at most $75
million should the StarBand venture fail, and Gilat
would not increase its exposure. (¶ 127.)

10) On May 14, 2001, Gat stated: "StarBand now is
fulfilling its vision of offering high-speed Internet
to virtually everyone in North America. (¶ 138.)

11) On July 11, 2001, StarBand, Gilat, and EchoStar
issued a joint press release announcing that EchoStar
would invest an additional $50 million in StarBand.
The complaint alleges that the release was misleading
because it failed to disclose that the agreement also
terminated a $37 million credit line previously
available to StarBand. (¶ 150.)

12) On August 13, 2001, defendants stated in a
conference call to investors that "EchoStar has
committed to build a new satellite" and that Gilat
would be entitled to a 20-22% ownership interest in
that satellite. (¶ 154.)

13) On November 12, 2001, Gat stated in a conference
call to investors that "in the next, for several
future, six quarters or so, absolutely the next year .
. . the only alternative for EchoStar is StarBand and
even beyond that . . . ." (¶ 171.)

14) On December 6, 2001, Gat stated in an interview
with Globes Online "[o]ne of EchoStar chairman and CEO
Charles Ergen's strongest arguments in favor of
approving the merger [with Hughes] is that only by
merger the two networks can he achieve massive, high-
speed Internet penetration in all the remote areas of
the US. That prognosis was based on EchoStar's use of
Gilat's working system." (¶ 176.)

<u>Revenue Statements Resulting from Gilat's Accounting</u>
<u>Practices</u>

The defendants also allegedly made the following statements

pertaining to Gilat's finances, which are allegedly fraudulent

because based on non-GAAP compliant accounting practices.

15) On February 28, 2000, Gilat issued a press release
announcing its assets and accounts receivable. (¶ 77.)

16) On May 15, 2000, Gilat issued a press release
announcing revenues, assets, and accounts receivable.
(¶ 81.)

17) On May 22, 2000, Gilat filed a Form 6-K with the
SEC, signed by Leibovitch, to which the May 15, 2000,
press release was attached. (¶ 85.)

18) On June 30, 2000, Gilat filed its 1999 Form 20-F
with the Securities Exchange Commission, repeating the
previously announced figures. The Form 20-F also
allegedly stated:

> In 1999, [Gilat] received orders for over 70,000
> interactive VSAT units. [Gilat's] interactive
> VSAT orders for 1999 are more than twice the
> orders received for interactive VSATs in 1998.
> The 1999 year-end backlog for equipment sales and
> revenues from multi-year service contracts for
> our VSAT products was over $300 million, an
> increase of more than 70% from the 1998 backlog
> of $175 million.

(¶ 86.)

19) The June 30, 2000, Form 20-F also allegedly stated
that "Revenues from sales of products were recognized
upon shipment to the customer." (¶ 86.)

20) On August 14, 2000, Gilat issued a press release
announcing accounts receivable, income, and revenue.
(¶ 90.)

21) On August 29, 2000, Gilat filed a Form 6-K,[3] signed
by Leibovitch, to which the August 14, 2000, press
release was attached. The Form 6-K repeated Gilat's

---

[3] Form 6-K is the means by which a foreign private issuer
furnishes information that it is required to make public in its
domicile, has filed with a foreign stock exchange and which that
exchange has made public, or has distributed to its security holders.
*See* 17 C.F.R. § 249.306.

reported financial results for the second quarter of
2000. (¶ 95.)

22) On November 13, 2000, Gilat issued another press
release announcing its assets, accounts receivable, and
revenues. (¶ 100.)

23) On November 15, 2000, Gilat hosted an analyst
luncheon at which Leibovitch repeated Gilat's
previously announced financial results. (¶¶ 106, 107.)

24) On November 16, 2000, Gilat filed another Form 6-K
reporting its financial results with the SEC, to which
the August 14, 2000 press release was attached. (¶
105.)

25) On March 12, 2001, Gilat issued a press release
announcing revenues, assets, and accounts receivable.
(¶ 119.)

26) On March 12, 2001, Gilat also revised its projected
revenue and income for 2001, blaming the change on
"challenging economic conditions" affecting the
technology sector. (¶ 118.)

27) On March 13, 2001 Gilat filed another Form 6-K with
the SEC which was false or misleading due to the
company's accounting practices. (¶ 121.)

28) On May 14, 2001, Gilat issued a press release
reporting its financial results for the first quarter
of 2001. (¶ 133.)

29) On May 17, 2001, Gilat filed with the SEC another
Form 6-K containing the financial results reported on
May 14, 2001. (¶ 136.)

30) On July 2, 2001, Gilat filed its annual report
covering the year 2000 on Form 20-F. (¶ 141.) The
report repeated the financial statements reported on
March 12, 2001.

31) The July 2, 2001, Form 20-F was also allegedly
fraudulent because it claimed that Gilat had a backlog
of 134,000 units, totaling $300 million. (¶ 142(iii).)

32) On July 11, 2001, Gilat announced that "its
revenues and gross margin are expected to approximate
previously announced guidance." (¶ 147.)

33) On August 13, 2001, Gilat issued a press release

announcing revenues for the second quarter ending June 30, 2001.  (¶ 158.)

34) On August 16, 2001, Gilat filed its Form 6-K, which repeated the statements contained in the August 13, 2001, press release.  (¶ 162.)

35) On October 2, 2001, Gilat issued a press release announcing that it would record a "non-cash, one-time charge[] that include[s] . . . bad debt reserve of approximately US$10 million reflecting deteriorating market conditions."  (¶ 164.)  The complaint alleges that this statement was materially misleading because Gilat's accounting practices required it to create a much larger debt reserve.  (¶ 166.)

36) On November 12, 2001, Gilat issued a press release announcing its financial results for the quarter ending September 30, 2001.  (¶ 168.)

37) On November 19, 2001, Gilat filed its Form 6-K which repeated the financial results contained in the November 12, 2001, press release.  (¶ 175.)

38) On February 19, 2002, Gilat announced its financial results for the quarter and year ending December 31, 2001.  (¶ 178.)  The release was false due to Gilat's accounting practices.  (¶ 179.)

39) On February 25, 2002, Gilat filed a Form 6-K which repeated the financial results contained in the February 19, 2002 press release.  (¶ 181.)

<u>Discussion</u>

I.  Prima Facie Rule 10b-5 and Section 10(b) Claims
    A.  Element One: False Statement or Omission
        1.  Statements Five
        2.  Statement Six
        3.  Statement Seven
        4.  Statements Eighteen and Thirty-One
    B.  Element Two: Materiality
        1.  Cautionary Language?
            a.  Statement Two
            b.  Statements Eight and Thirty-Two
            c.  Statements Twelve and Thirteen
    C.  Element Three: Scienter
        1.  Non-Cautionary Forward Looking Statements: Actual Knowledge
            a.  Statement One
            b.  Statement Three
            c.  Statement Four

               d.    Statement Nine
               e.    Statement Fourteen
        2.    Statements of Present or Historical Fact:
             Recklessness
               a.    StarBand Statements
                   i.    Statement Ten
                   ii.  Statement Eleven
               b.    GAAP violations
                   i.    Motive and Opportunity
                   ii.  Strong Circumstantial Evidence of
                       Conscious Misbehavior or Recklessness
II.  Statute of Limitations
    A.    Applicability of the Sarbanes-Oxley Act
    B.    When the Claims Accrued
    C.    Relation back of Allegations in the August 25, 2004
        Complaint
III. Section 20(a) of the Exchange Act Claim
IV.  Leave to Replead

In considering a motion to dismiss under Rule 12(b)(6), a "court must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001). A complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim. *Freedom Holdings, Inc.*, v. Spitzer, 357 F.3d 205, 216 (2d Cir. 2004).

Securities fraud complaints are, however, subject to the heightened pleading standards imposed by Federal Rule of Civil Procedure 9(b). Rule 9(b) requires that [i]n all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity." The Second Circuit has read Rule 9(b) to require the complaint to: 1) specify the statements that the plaintiff contends were fraudulent; 2) identify the speaker; 3) state where and when the statement was made; and 4) explain

why it was fraudulent.  *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737, also modifies the standard Rule 12(b)(6) analysis in three ways: First, the PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  Second, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  Third, the PSLRA mandates that on a motion to dismiss a claim based on "forward-looking" statements, the Court is to consider "any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant."  15 U.S.C. § 78u-5(e).

I. <u>Section 10(b) and Rule 10b-5 Claims</u>

Rule 10b-5 states, in part, that it is "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5.  To state a claim for relief under section 10(b) and Rule 10b-5, a plaintiff must allege that the defendant: 1) made misstatements

or omissions of fact; 2) that were material; 3) with scienter; 4)
in connection with the purchase or sale of securities; 5) upon
which the plaintiff relied; 6) economic loss; and 7) loss
causation. *See Dura Pharm., Inc. v. Proudo*, 125 S.Ct. 1627, 1631
(2005); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d
Cir. 2005). Defendants challenge the sufficiency of plaintiffs'
allegations to support the first three elements of the claim.

A.  Element One: False Statement or Omission

Defendants contend that the complaint does not adequately
allege that statements 5, 6, 18, and 31 were false when made.
The PSLRA requires a plaintiff to plead for each fraudulent
statement "the reason or reasons why the statement is misleading,
and, if an allegation regarding the statement or omission is made
on information and belief, the complaint shall state with
particularity all facts on which that belief is formed." 15
U.S.C. § 78u-4(b)(1). The complaint must plead facts sufficient
to support plaintiffs' belief that the statements were false when
made. *Rombach*, 355 F.3d at 172.

1. Statement Five

Statement five refers to the statement on StarBand's website
that StarBand had stopped taking orders due to the "overwhelming
response for" StarBand. Defendants contend that the complaint
cites to no evidence that this statement was false when made.
But the complaint supports this allegation by reference to
statements by confidential witness 2 ("CW2"). CW2 is identified

as the Director of Sales at StarBand from June 2000 until
November 2001. (¶ 43.) According to CW2, StarBand was only
adding eighty to ninety customers a day when it stopped taking
advanced orders. Accordingly, the complaint adequately pleads
that there was no "overwhelming response" for StarBand.

  2.  Statement Six

  Statement six refers to the March 12, 2001, press release in
which Gilat stated that it was withdrawing the StarBand IPO due
to weak financial markets. The complaint alleges that StarBand
actually withdrew the IPO and ceased taking orders because of
technical problems with StarBand resulting in slow connection
speeds and because EchoStar had ceased marketing StarBand.

  The complaint supports this allegation with statements of
CW2 and confidential witnesses three ("CW3"). (¶ 114.) CW3 is
identified as Vice President of Sales and Distribution at
StarBand from September 2000 through June 2002. (¶ 44.)
According to the complaint, CW2 stated that EchoStar stopped
marketing StarBand some time in March 2001 and that at the time
the IPO was withdrawn, StarBand was adding only 80 to 90 new
customers a day. (¶ 114(a), (b).) CW3 stated that, when
StarBand was introduced in November 2000, it was sold with a
modem that was inferior to the version originally planned. (¶
114(c).) The complaint also cites a posting on an internet
bulletin board and an internet-published review which contain
complaints concerning StarBand's performance. (¶ 114(g).) In
addition, the complaint alleges that Beta Testers and customers

at some point complained that StarBand was not achieving advertised speeds.

Defendants correctly contend that these allegations merely posit a different reason for StarBand's actions, but do not tend to rebut StarBand's stated motivation. *See In re Cornerstone Propane Partners*, 355 F. Supp. 2d 1069, 1085 (N.D. Cal. 2005) (where allegations in complaint and statement made by defendant are not inconsistent, securities fraud complaint does not adequately plead falsity); *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 158 (S.D.N.Y. 2004) (under PSLRA, where allegedly fraudulent statement concerned declarant's motive, complaint must allege facts from which a factfinder can infer that the opinion was not truly held). Indeed, the complaint alleges that the technical problems with StarBand were not publicly known at the time the IPO was withdrawn. Plaintiffs' allegations therefore do not support a belief that the IPO was withdrawn solely because of technical difficulties and not because of weak financial markets. As a result, the complaint does not plead with sufficient particularity that statement six was false when made.

### 3. Statement Seven

The complaint alleges that on March 12, 2001, Gat stated in a conference call with investors that "at this point in time, we're expanding into new distribution channels in Q2." (¶ 123.) The defendants submit a transcript of the conversation that quotes Gat actually as stating "Our expansion into new

distribution channels in Q2, we announced the National Rural Telecommunications cooperative, the NRTC. And StarBand has already signed with other national and regional retailers, which we expect to announce in Q1 and Q2." (Def. Ex. 7.) The defendants contend that the complaint does not adequately allege that the statement contained in the transcript they submit is false.

In ruling on a motion to dismiss the complaint based on materiality, the PSLRA permits a court to consider "any statement cited in the complaint and any cautionary statements accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant." 15 U.S.C. § 78u-5(e). The portion of the transcript that the defendants submit for the Court's consideration is in no stretch of the imagination a "cautionary statement." Accordingly, it is not appropriately considered in ruling on whether complaint adequately alleges that the statement in question occurred and was false, and the Court must take as true that Gat stated what the complaint alleges that he stated.[4]

4. <u>Statements Eighteen and Thirty-One</u>

---

[4] This situation is unlike that in which the allegedly fraudulent statement was made in a document from which the complaint selectively quotes. *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co.*, 75 F.3d 801, 808-09 (2d Cir. 1996). In such a case, the plaintiff necessarily relies on the document in framing his complaint, and consideration of its undisputed content is appropriate in a motion to dismiss. The exhibit the defendants submit is a transcript of a conversation. The complaint in this case relies on the conversation, not the transcript, which is merely evidence of the content of the conversation.

Statements eighteen and thirty-one refer to the number of back orders for Gilat's satellite dishes as reported in Gilat's Form 20-F statements filed on June 30, 1999, and July 2, 2001. The complaint alleges that the statement is fraudulent because confidential witness one ("CW1") informed the plaintiffs that the reported backlog "was based on 'things imagined and thought of and not final purchase orders.' " (¶¶ 87(b), 143(b).) The Complaint identifies CW1 as a former Gilat employee in the Finance Division who had personal knowledge of Gilat's accounting, billing, and collection systems. (¶ 42.) Defendants contend that because the complaint relies solely on vague statements by a confidential witness, it has not properly pled with particularity that statement eighteen and thirty-one were false when made. Plaintiffs do not respond to this argument in their submissions.

The Second Circuit has held that a securities fraud complaint need not always disclose the identity of confidential witnesses who provide the basis for the belief that a statement was false. *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000). When the complaint relies on statements by confidential witnesses, *Novak* requires "an examination of the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp*., 394 F.3d 126, 147 (3d Cir.

2004).  If after considering all of these factors, a reasonable person would believe the statement was false or misleading, the complaint has sufficiently pled falsity with particularity.

Here, however, the complaint merely basis its allegations on a single, vague statement made by one employee occupying an unidentified position in the Finance Division.  No details are provided and no other facts are alleged.  Where the complaint merely identifies a confidential witness who makes conclusory allegations that the statement was false, the complaint has not provided the level of detail required to support a reasonable belief that the statement was false.  Accordingly, the complaint fails to plead with sufficient particularity that statements 18 and 31 were false when made.

B.  <u>Element Two: Materiality</u>

To present an actionable claim for securities fraud, the complaint must identify misstatements that are material. Defendants argue that statements 2, 8, 12, 13, and 32 are immaterial as a matter of law because they fall within the PSLRA's safe harbor.  The test for materiality is whether the representations, when viewed as a whole, would mislead a reasonable investor.  *Rombach*, 355 F.3d at 178 n.11.  An alleged misstatement or omission is material if there is a substantial likelihood that a reasonable investor would view the statement or omission as significantly altering the "total mix" of information available.  *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).

The PSLRA provides an additional limit on materiality when the challenged statement is "forward-looking." Forward-looking statements are defined as including:

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
>
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
>
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission

15 U.S.C. § 78u-5(i). Statements concerning historical or current facts do not qualify as "forward-looking." *In re Regeneron Pharm., Inc. Sec. Litig.*, 2005 WL 225288, at *13 (S.D.N.Y. Feb. 1, 2005); *In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314, 240 (S.D.N.Y. 2001).

The PSLRA defines the safe harbor's protection as follows:

> A forward looking statement is protected:
>
> to the extent that--
>
> (A) the forward-looking statement is--
>
>> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
>>
>> (ii) immaterial; or
>
> (B) the plaintiff fails to prove that the forward-looking statement--
>
>> (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading
>>
>> (ii) if made by a business entity; was--
>>
>>> (I) made by or with the approval of an executive

officer of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c).

The parties interpret this language differently. According to the plaintiffs' reading of the statute, the safe harbor does not protect forward-looking statements that are known by the defendant to be false when made. *See In re Priceline.Com Inc., Sec. Litig.*, 342 F. Supp. 2d 33, 49 (D. Conn. 2004); *In re Alliance Pharm. Corp Sec. Litig.,* 279 F. Supp. 2d 171, 192 (S.D.N.Y. 2003) (stating that the PSLRA does not protect the defendant when the statement was knowingly false when made).

The defendants contend, and the weight of authority holds, that a defendant can rely on the statutory safe harbor in any of the following three situations: (1) the allegedly fraudulent forward-looking statement was accompanied by meaningful cautionary language, 15 U.S.C. § 78u-5(c)(A)(i); (2) the statement was otherwise immaterial, 15 U.S.C. § 78u-5(c)(A)(ii); or (3) the defendant did not have actual knowledge that the forward-looking statement was misleading or false.[5] The defendants claim, in other words, that even if a forward-looking statement is made with actual knowledge of its falsity, it is

---

[5] 15 U.S.C. § 78u-5(c)(1)(B); *see In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 568 n.3 (6th Cir. 2004); *Broudo v. Dura Pharm., Inc.*, 339 F.3d 933, 939 (9th Cir. 2003), *rev'd on other grounds*, 125 S.Ct. 1627; *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999); *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1168 (N.D. Ill. 2004); *Sandmire v. Alliant Energy Corp.*, 296 F. Supp. 2d 950, 958 (W.D. Wis. 2003); 2 THOMAS LEE HAZEN, THE LAW OF SECURITIES REGULATION 479 (4th ed. 2002).

protected by the safe harbor so long as it was identified as forward-looking and accompanied by meaningful cautionary language. As the parties' citations reveal, courts have adopted both interpretations,[6] but neither the parties' nor the Court's research reveals controlling Second Circuit authority.

The differing interpretations appear to stem from the history of limits on the materiality of forward-looking statements. Prior to the passage of the PSLRA, courts limited the extent to which false statements were material through the common law "bespeaks caution" doctrine. *See generally* 2 HAZEN, at § 12.9[8]. Under the "bespeaks caution" doctrine, "[c]ertain alleged misrepresentations in a stock offering are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." *Halperin*, 295 F.3d at 357. Like the PSLRA safe harbor, the bespeaks caution doctrine is limited to forward-looking statements, and not statements of present fact. *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004). Although materiality had traditionally been a highly factual inquiry, courts regularly

---

[6] Some courts inexplicably adopt both interpretations in the same opinion without noting the inconsistency. *See, e.g., In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 586-76 (S.D. Tex. 2002) (stating first that "[i]f a statement is 'accompanied by meaningful cautionary statements,' the defendant's state of mind is not relevant" and then that "[t]he safe harbor provision does not apply where the defendants knew at the time they were issuing statements that the statements contained false and misleading information"); *In re Landry's Seafood Rest., Inc.*, H-99-1948, 2001 WL 34115784, at *20 (S.D. Tex. Feb. 20, 2001) (essentially the same).

used the bespeaks caution doctrine to dismiss securities fraud complaints on a Rule 12(b)(6) motion.

Prior to the PSLRA, some courts held that the bespeaks caution doctrine did not apply where the defendant knew that his forward-looking statement was false when made. *See, e.g., In re Worlds of Wonder Sec. Litig.*, 814 F. Supp. 850, 858 (N.D. Cal. 1993). The rationale for this limitation is that often a forward-looking statement of future intent or expectation implicitly contains a non-forward looking component. For example, if a corporation announces that it will take some future action, the corporation may also be read implicitly to represent that it has the present intent to follow through on that promise. *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1213 (1st Cir. 1996). The present component of a statement is not protected by the bespeaks caution doctrine because it is not "forward-looking."

The PSLRA safe harbor is sufficiently similar to prior law that some courts and commentators have described it as "codifying" the bespeaks caution doctrine. *See, e.g., Shaw*, 82 F.3d at 1213 n.23; *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 881-82 (N.D. Cal. 2004); 2 HAZEN, § 12.9[8], at 482-83. Accordingly, the Second Circuit has at times applied the bespeaks caution doctrine in conjunction with the PSLRA safe harbor without distinguishing between the two. *See Rombach*, 355 F.3d 164. The two doctrines do not, however, completely

overlap,[7] and Congress did not intend for the PSLRA safe harbor to replace the bespeaks caution doctrine or to foreclose its further common law development.  H.R. CONF. REP. NO. 104-369, at 46 ("The Conference Committee does not intend for the safe harbor provisions to replace the judicial 'bespeaks caution' doctrine . . . .").

Those courts that apply plaintiffs' interpretation of the PSLRA do so by relying on cases interpreting the bespeaks caution doctrine without analysis of the PSLRA's language.  *See, e.g., In re Globalstar Sec. Litig.*, 2003 WL 22953163, at *9; *In re Priceline.Com Inc. Sec. Litig.*, 342 F. Supp. 2d at 49.  Because the two doctrines provide separate limits on materiality, reliance on cases interpreting the bespeaks caution doctrine is of limited use when those cases conflict with the language of the PSLRA.

Those courts that adopt the defendants' interpretation do so after careful examination of the PSLRA's language and legislative history.  These courts reason that because the statute uses the disjunctive "or" between subsections A and B, the statute creates two independent inlets to the safe harbor.[8]  Under this majority

---

[7] *See* Erin M. Hardtke, Comment, *What's Wrong with the Safe Harbor for Forward-Looking Statements?,* 81 MARQ. L. REV. 133, 151-53 (1997) (stating that PSLRA does not cover IPO's, partnership offerings, tender offers, and "going private" transactions while the "bespeaks caution" doctrine does).

[8] *See Helwig v. Vencor, Inc.*, 251 F.3d 540, 555 n.2 (6th Cir. 2001) (en banc);  *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999); *In re ATI Tech., Inc. Sec. Litig.*, 216 F. Supp. 2d 418, 429 (E.D. Pa. 2002); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d

(continued...)

reading, the first prong of the PSLRA safe harbor places a limit on materiality.  Once a court determines that a forward-looking statement is accompanied by cautionary language sufficiently meaningful as to render it incapable of being reasonably relied upon, it is immaterial as a matter of law and the court need not consider the defendants' state of mind.  The second prong, subsection B, imposes a heightened scienter requirement for forward-looking statements not accompanied by cautionary language.  Those false statements are immunized so long as they were not knowingly false.  *See* John C. Coffee, *The Future of the Private Securities Litigation Reform Act*, 51 BUS. LAW. 975, 989 (1996).

This interpretation is in accord with the legislative history of the PSLRA.[9]  The House Conference Report instructs that in applying subsection A of the safe harbor "[c]ourts should not examine the state of mind of the person making the statement."  H.R. CONF. REP. NO. 369, at 44.

This result has also been defended as a matter of policy on

---

[8](...continued)
1059, 1068 n.4 (N.D. Cal. 2001).

[9] Jennifer O'Hare, *Good Faith and the Bespeaks Caution Doctrine: It's Not Just a State of Mind*, 58 U. PITT. L. REV. 619, (1997) ("The Reform Act's legislative history makes the absence of a state-of-mind requirement abundantly clear."); 141 CONG. REC. S19060-02 (statement by Senator Feinstein that the safe harbor protects forward-looking statements if they are either "accompanied by clear warning . . . "[o]r, as a separate test . . . the safe harbor does not apply if the statement is made with 'actual knowledge' that the statement was 'an untrue statement of a material fact' "); 141 CONG. REC. H15214-06 (statement of Rep. Markey opposing the Act on the grounds that it renders '[t]he state of mind of the [defendant] irrelevant, even if [he] intentionally lies to the investing public").

the ground that the PSLRA safe harbor is a limit on materiality, not scienter. Where the knowingly false statement is sufficiently hedged by cautionary language, the PSLRA states that no reasonable investor could rely on it as a matter of law. *See* Rosen, *supra* at 657. In addition, the PSLRA "reflects the recognition that the social costs, in the aggregate and over the long haul, of a rule that always allows plaintiffs discovery on the question of the state of mind of defendants in every case are just too high." *Id.; see also* O'Hare, *supra* at § III.

1. <u>Cautionary Language?</u>

Defendants contend, and plaintiffs do not dispute, that statements 2, 8, 12, 13, and 32 are forward-looking. Plaintiffs contend, however, that these statements are "boilerplate" and are not sufficiently "meaningful" to be protected by the PSLRA safe harbor.

The PSLRA safe harbor requires that the cautionary language "identify[] important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(A)(i). Because the PSLRA requires that on a motion to dismiss, a court is to consider cautionary statements that are not subject to material dispute, the issue of whether cautionary language is forward-looking or sufficiently meaningful is frequently one of law. *See* 15 U.S.C. § 78u-5(e); *Helwig*, 251 F.3d at 554; *In re ESS Tech., Inc., Sec. Litig.*, 02-4497, 2004 WL 3030058, at *8 (N.D. Cal. Dec. 1, 2004); *Sandmire v. Alliant Energy Corp.*, 296 F. Supp. 2d 950, 958 (W.D. Wis. 2003).

Statements such as "this is a forward-looking statement: caveat emptor," do not suffice. *Asher v. Baxter Int'l, Inc.*, 377 F.3d 727, 729 (7th Cir. 2004). The safe harbor analysis only begins when the firm's statements are false or misleading, "yet whenever that condition is satisfied, one can complain that the cautionary statement must have been inadequate." *Id.* at 732. However, such a reading of the statute would render the safe harbor meaningless. *Id.* It is therefore sufficient that the language merely identify "the principal contingencies that could cause actual results to depart from the projection." *Id.* at 734.

Where plaintiffs proceed on a fraud-on-the-market theory,[10] as plaintiffs do in this case, the defendants' cautionary statements "must be treated as if attached to every one of its oral and written statements." *Id.* at 732. Under this reasoning, the Court must consider whether any cautionary language provided by the defendants at any time sufficiently warned of the risk of which plaintiffs complain. *Id.; see also GSC Partners CDP Fund v. Washington,* 368 F.3d 228, 243 n.3 (3d Cir. 2004) (cautionary

---

[10] "Fraud on the market" is a method by which plaintiffs may satisfy their burden of proving reliance in securities fraud actions. In an efficient market, the dissemination of material misrepresentations affects the price of a stock, and purchasers typically rely on the price of a stock as a reflection of its value. *See Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Plaintiffs can thereby benefit from a rebuttable presumption that persons who traded Gilat shares did so in reliance on the integrity of the price set by the market, which was allegedly subverted by the defendants' misrepresentations.

Because the fraud-on-the-market theory presumes that the stock market is informationally efficient and defendants' false statements are reflected in the price of Gilat stock, the plaintiffs must implicitly concede that the price of Gilat stock also reflected all publicly available cautionary statements. *Asher*, 377 F.3d at 732.

language need not actually accompany the alleged

misrepresentation).

a.  Statement Two

Statement two refers to Gilat's February 2000 press release,

which claimed that StarBand users would enjoy access speeds ten

times faster than dial-up modems.  Statement two was accompanied

by the following cautionary language:

> Certain statements herein that are not historical are
> forward-looking within the meaning of the Private Securities
> Litigation Reform Act of 1995.  The words "estimate,"
> "project," "intend," "expect," "believe" and similar
> expressions are intended to identify forward-looking
> statements.  These forward-looking statements involve known
> and unknown risks and uncertainties.  Many factors could
> cause the actual results, performance, or achievements of
> Gilat to be materially different from any future results,
> performance or achievements that may be expressed or implied
> by such forward-looking statements, including, among others,
> changes in general economic and business conditions,
> inability to maintain market acceptance to Gilat's products,
> *inability to timely develop and introduce new technologies*,
> products and applications, rapid changes in the market for
> Gilat's products, loss of market share and pressure on
> prices resulting from competition, introduction of competing
> products by other companies, inability to manage growth and
> expansion, loss of key OEM partners, inability to attract
> and retain qualified personnel, inability to protect he
> company's proprietary technology and risks associated with
> Gilat's international operations and its location in Israel.
> For additional information regarding these and other risks
> and uncertainties associated with Gilat's business,
> reference is made to Gilat's reports filed from time to time
> with the Securities Exchange Commission.

(Def. Ex. 1 (emphasis added).)

The risk that plaintiffs complain of with regard to

statement two is the risk that StarBand would not be able to

deliver high-speed internet access by its launch in November

2000.  This is the risk of delayed technological development,

which is explicitly identified in the press release and goes

beyond "mere boilerplate."  Although defendants could have been more helpful had they disclosed any specific anticipated technological difficulties, the PSLRA does not require defendants "to reveal in detail what could go wrong."  *Asher*, 377 F.3d at 734.

      b.  <u>Statements Eight and Thirty-Two</u>

Statement eight refers to the March 12, 2001 conference call during which Gat assured investors that Gilat's exposure in the StarBand project would be limited to $75 million.  Statement thirty-two concerns the July 11, 2001, press release announcing that Gilat's revenues were in line with previously announced projections.  The complaint alleges that these statements were false because Gilat was inflating reported revenues and hiding accounts receivable owed by StarBand to Gilat through non-GAAP accounting practices.  At the inception of the March 12, 2001, call, Gat read the following statement:

> Certain statements made herein that are not historical are forward-looking within the meaning of the Private Securities Litigation Reform Act of 1995.  The words "estimate", "project", "intend", "expect", "believe" and similar expressions are intended to identify forward-looking statements.  These forward-looking statements involve known and unknown risks and uncertainties.  Many factors could cause the actual results, performance or achievements of the Company to be materially different from any future results, performance or achievements that may be expressed or implied by such forward-looking statements.  For additional information regarding the risks and uncertainties associated with the company's business, reference is made to the company's reports filed from time-to-time with the Securities and Exchange Commission.

(Def. Ex. 7.)  The press release contains a similar extensive list of cautionary language.

The complaint alleges that the important risk that the defendants failed to warn about was the danger that Gilat's accounting practices were not in accordance with GAAP. This risk is not accounted for in any of Gilat's cautionary statements presented by the defendants. Accordingly, I cannot conclude that defendants' cautionary statements rendered either statement immaterial as a matter of law.

### c.  Statements Twelve and Thirteen

Statement twelve refers to the August 13, 2001, conference call in which Gat stated that EchoStar had committed to building a new satellite. Statement thirteen concerns the November 12, 2001, conference call in which Gat states that for the next six quarters "the only alternative for EchoStar is StarBand." The complaint alleges that these statements were false because EchoStar's commitment was not binding, and that it would eventually back out of the arrangement. These conference calls were preceded by the same warning that preceded the conversation in which statement eight was made, and refers listeners to Gilat's filings with the SEC for fuller disclosure of risks. Gilat's Form 20-F filed July 2, 2001, states that although Gilat and EchoStar have entered into a memorandum agreement, EchoStar "is subject to no penalties if it ceases to sell the Company's services." (Def. Ex. 4.) This sufficiently warns of the risk of EchoStar's ability to back out of the agreement.

### C.  Element Three: Scienter

The Private Securities Litigation Reform Act and Rule 9(b)

impose heightened pleading requirements for securities fraud claims with respect to scienter. First, the PSLRA states that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Second, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). This necessarily requires the Court to engage examine not only the particularity of the pleading but to some extent its probative force. *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867 (5th Cir. 2003).

The PSLRA imposes three distinct scienter requirements for securities fraud actions, depending on what type of statement was made. *Miller v. Champion Enter., Inc.*, 346 F.3d 660, 672 (6th Cir. 2003). First, because "forward-looking" statements that are accompanied by meaningful cautionary language are immaterial as a matter of law, the defendant's state of mind is irrelevant. 15 U.S.C. § 78u-5(c)(1)(A); *Miller*, 346 F.3d 672; *Harris*, 182 F.3d at 803. The second prong of the PSLRA safe harbor immunizes "forward-looking" statements that are *not* accompanied by cautionary language unless they are made with actual knowledge that they are misleading or false. *Miller,* 346 F.3d at 672. Third, a statement of present or historical fact is actionable

only if made with actual knowledge of falsity or recklessness.
*Id*.

1.   <u>Non-Cautionary Forward Looking Statements: Actual
     Knowledge</u>

Defendants contend that statements 1, 3, 4, 9, and 14 are
forward-looking and that plaintiffs have not alleged facts from
which it may be inferred that they were made with knowledge that
they were false.  Plaintiffs do not dispute that statements one,
three, nine, and fourteen are forward-looking.

a.   <u>Statement One</u>

Gat made statement one on February 9, 2000, prior to
StarBand's launch, when he announced that "Gilat expects to have
1 [million] U.S. subscribers by 2003."  The complaint further
alleges that Gat "lacked any reasonable basis in fact to make
such a statement" because StarBand was still being tested and its
subscriber base would be contingent upon customer acceptance of
satellite-based internet service, the competitiveness of
satellite-based internet service with respect to other
transmission methods, whether StarBand could break into the U.S.
market, and whether the business was economically feasible.  (¶
67.)  Because it merely identifies factors suggesting that by
failing to account for potential obstacles to StarBand's success
Gat's prediction was overly optimistic, the complaint can at best
be read to allege no more than that Gat was reckless in making
the statement.

b.   <u>Statement Three</u>

Statement three was made on February 20, 2000, in a Gilat

press release that stated that StarBand would provide internet access speeds up to 400 times faster than IDSN lines.  The complaint alleges that the defendants "lacked any reasonable basis in fact to make such a statement" because beta testers and customers would later reveal that StarBand was not capable of such high speeds.  The complaint does not allege that defendants knew, in February 2000, of any facts contrary to their statement.  At best, therefore, the complaint alleges that statement three was made recklessly, which is an insufficient basis for liability for forward looking statements.

    c.  <u>Statement Four</u>

Gilat made statement four on September 11, 2000, when it announced that StarBand customers "will have their first opportunity to enjoy an always-on, two-way, high-speed Internet experience . . . without the constraints of a cable or telephone wire."  (¶ 97.)  Plaintiffs contend that statement four is not forward-looking because it purports to state present facts and should therefore be subject to the lower "recklessness" scienter requirement.

Statement four falls under the PSLRA's definition of "forward-looking statements" because it is "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer."  15 U.S.C. § 78u-5(i)(1)(B).  The statement consists of the defendants' plan to release a functioning satellite-based system to customers in the future.

The statement is an expression of the optimistic objective of achieving a successful launch of the new StarBand product. *See In re Columbia Lab., Inc. Sec. Litig.*, 144 F. Supp. 2d 1362 (S.D. Fla. 2001) ("[S]tatements made by Defendants regarding [experimental product], touting its possible effectiveness, and promoting its marketability clearly constitute forward-looking statements"). Accordingly, to survive the motion to dismiss, the complaint must allege the statement was made with knowledge of its falsity.

The complaint alleges that statement four was made "without a reasonable basis in fact" (¶ 99) because: (1) unidentified Beta testers of StarBand stated in October 2000 that StarBand could not achieve download speeds as advertised (¶ 114(e)); (2) CW3 stated that when StarBand was ultimately released, sales began with a modem which was inferior compared to that which was originally planned (¶ 114(c)); and (3) postings on an internet newsgroup and an article published on the internet criticized StarBand's capabilities, all of which appeared after statement four was made. (¶¶ 61, 114(g-h).) Defendants correctly contend that the complaint does not point to any evidence available before September 11, 2000, the date that statement four was made, that StarBand would not be able to perform as promised. These facts, all of which occurred after statement four was made, do not give rise to a strong inference that defendants knew that StarBand's performance would be poor.

d. <u>Statement Nine</u>

Statement Nine was made on March 14, 2001, when Leibovitch stated in an interview with *Globes Online,* "If we really don't manage to raise money and our exposure reaches a maximum of $75 million . . . we will reconsider, even if it means StarBand will raise money without us. . . . We promised the investors yesterday that Gilat would not increase its exposure in its own name." (¶ 127.) The complaint alleges, however, that the $75 million figure was knowingly false because it failed to include funds owed by entities that were, in effect, StarBand's alter egos. (¶ 128.) The complaint alleges that, after including the account receivables owed by these alter egos, Gilat would eventually be exposed to more than $75 million of potential loss from the StarBand project.

To survive a motion to dismiss, the complaint must allege facts giving rise to a strong inference that Leibovitch knew at the time the statement was made that there was little or no chance that the $75 million cap would not be exceeded. Plaintiffs contend that the complaint meets this standard because Leibovitch knew that StarBand was experiencing financial difficulties, EchoStar's commitment to StarBand was waivering, and StarBand's service was technologically flawed. These allegations, however, go no further than to permit an inference that Leibovitch's prediction was reckless, not that he had actual knowledge that Gilat planned to increase its exposure beyond the $75 million cap.

e. <u>Statement Fourteen</u>

Statement fourteen was made on December 6, 2001, when Gat stated in an interview with *Globes Online,* "One of EchoStar chairman and CEO Charles Ergen's strongest arguments in favor of approving the merger [with Hughes] is that only by merger the two networks can he achieve massive, high-speed Internet penetration in all the remote areas of the US. That prognosis was based on EchoStar's use of Gilat's working system." (¶ 176.) The complaint alleges that this statement was false because EchoStar's commitment to StarBand was dissipating.

The complaint alleges that Gat knew that this statement was false "in light of the meeting he had with, among others, Charles Ergen, Feldman and Tracy Friedlander in or about November 2001." (¶ 177.) The complaint does not elaborate on the identity of Feldman or Tracy Friedlander, or allege what was stated in that meeting that would give Gat actual knowledge that EchoStar's commitment to StarBand was less than secure. The complaint therefor does not allege facts giving rise to a strong inference that Gat had knowledge, on December 6, 2001, that EchoStar would end its relationship with StarBand.

### 2. Statements of Present or Historical Fact: Recklessness

For securities fraud claims based on statements of present or historical fact, the complaint must allege facts giving rise to a strong inference that the defendant was at the least reckless with regard to truth. *Rombach,* 355 F.3d at 176. The Second Circuit has identified two ways for plaintiffs to meet this burden: (1) by alleging facts showing that defendants had

motive and opportunity to commit fraud; or (2) by alleging facts that constitute strong circumstantial evidence of conscious knowledge or recklessness. *Id.*

To adequately allege that a defendant had a motive to commit securities fraud, the complaint must identify a "concrete benefit" that the particular defendant stood to accrue from his deception. *See id.* at 177. The alleged motive must be one that is not commonly held by all corporations or corporate executives. *Id.* One common method of pleading motive and opportunity is by allegations that a corporate insider misrepresented material facts about the corporation's performance prospects in order to elevate the stock price, while selling his own shares at a profit. *Novak*, 216 F.3d at 308. Examples of motives that are insufficient to adequately plead motive include: (1) that a corporate officer was motivated to make the corporation or one of its investments appear profitable, *id.*; (2) that a corporate officer was motivated by the desire to keep stock prices high in order to increase officer compensation, *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001); (3) that, absent allegations of insider trading, a corporate officer owned stock in the corporation, *id.* at 141; or (4) the desire to maintain a high corporate credit rating, *Novak*, 216 F.3d at 307.

To plead scienter under the "strong circumstantial evidence of conscious misbehavior or recklessness" method, plaintiffs must allege conduct that is 'highly unreasonable' and 'an extreme departure from the standards of ordinary care . . . to the extent

that the danger was either known to the defendant or so obvious
that the defendant must have been aware of it.'" *In re
Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001)
(quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d
Cir. 1978)).  The Second Circuit has stated that this standard is
satisfied where the complaint alleges that the defendants: "(1)
benefitted in a concrete and personal way from the purported
fraud; (2) engaged in deliberately illegal behavior; (3) knew
facts or had access to information suggesting that their public
statements were not accurate; or (4) failed to check information
they had a duty to monitor." *Novak*, 216 F.3d at 311.  Conclusory
allegations will not suffice.  The complaint must provide a
sufficient factual basis to provide a strong inference of
scienter.  *Kalnit*, 264 F.3d at 138.  Where the complaint alleges
that the defendants had access to facts which contradicted their
statements, they must specifically identify the reports or
statements containing this information.  *Novak*, 216 F.3d at 309.
The mere juxtaposition of a defendant's optimistic statements and
a corporation's poor subsequent performance is insufficient.  *See
Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir.
1994).

    a.  <u>StarBand Statements</u>

    The defendants argue that the complaint does not adequately
plead recklessness or conscious misstatement with regards to
statements ten and eleven.  The plaintiffs contend that the
complaint alleges facts giving rise to a strong inference of

recklessness or conscious misbehavior.

    i.  <u>Statement Ten</u>

Statement ten was made on May 14, 2001, when Gat stated:
"StarBand now is fulfilling its vision of offering high-speed
Internet to virtually everyone in North America." (¶ 138.)  The
complaint alleges that this statement was false because
StarBand's technical problems rendered it "slower than dial up."
(Plaintiffs' Memo. 29.)  Plaintiffs contend that the complaint
alleges strong circumstantial evidence of recklessness because:
(1) a posting appeared on an internet bulletin board stating that
StarBand was not achieving its advertised speeds, (¶ 114(g)); (2)
a reviewer wrote an article stating, "[StarBand] worked nearly as
advertised.  I say 'nearly' because the speeds aren't as high as
StarBand claims," (¶ 114(h); and (3) Beta testers stated in
October, 2000, that StarBand could not achieve advertised speeds.
(¶ 114(e).)

    These allegations do not provide a strong inference of
recklessness.  The complaint does not allege to what extent beta
testers criticized StarBand's performance, or to whom.  Nor does
the complaint allege the existence of any internal reports or
memoranda produced by these unidentified beta testers that would
indicate that StarBand was "slower than dialup."  Nor could the
one posting on an internet bulletin board and a single review
which stated that the product worked "nearly as advertised" put
Gat on sufficient notice of StarBand's poor performance to render
his statement reckless.  *Cf. In re Carter-Wallace Sec. Litig.*,

220 F.3d 36 (2d Cir. 2000) (complaints about adverse effects of a drug must reach the level of statistical significance before defendant is put on sufficient notice to render his failure to disclose reckless).

   ii.  <u>Statement Eleven</u>

Statement eleven refers to a July 11, 2001, joint press release issued by Gilat, StarBand, and EchoStar, announcing that EchoStar had agreed to invest an additional $50 million in StarBand.  The press release failed to disclose that the same agreement resulted in the termination of a $37 million line of credit previously available to StarBand.  Because the complaint alleges that both of these agreements were part of the same transaction, it has sufficiently alleged that the defendants had knowledge of the allegedly material omission.

   b.  <u>GAAP Violations</u>

Defendants contend that the complaint fails to adequately allege recklessness with regard to any of the statements that are allegedly false due to Gilat's accounting practices.  The plaintiffs' contend that they have adequately alleged that these statements were recklessly made through both: (1) allegations of motive and opportunity; and (2) facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.

   i.  <u>Motive and Opportunity</u>

Defendants do not dispute that they had the opportunity to commit fraud.  They contend instead that plaintiffs have not

sufficiently pled motive.  The plaintiffs contend that Gat's motive to defraud is sufficiently pled by allegations that he held 3.8% of StarBand's stock.  This ownership interest, plaintiffs contend, gave Gat an incentive to inflate the value of StarBand stock.  Plaintiffs do not, however, point to any allegations that Gat engaged in insider trading.  Mere ownership of stock, without more, are insufficient to establish motive.  *See Kalnit*, 264 F.3d at 141.  Because most corporate directors own stock in the companies they serve, permitting motive to be pled on the basis simply of ownership of stock would expose virtually every company in the United States that suffered a dip in stock price to allegations of securities fraud.[11]  The complaint therefore fails to allege that Gat had sufficient motive to defraud investors.

With respect to corporate defendant Gilat, the complaint asserts that by inflating revenues and hiding bad debts, Gilat sought to make itself an attractive investment to facilitate the raising of capital.  (¶¶ 202-05.)  This additional capital, the complaint alleges, would be invested in StarBand, thereby permitting Gilat to "enter into the lucrative United States consumer market."  (¶ 204.)

---

[11] *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (allegations that director delayed negative press release until after he sold 30,000 shares of company stock insufficient absent factual allegations suggesting sale was unusual); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) ("Absent some . . . allegation to explain how a defendant benefits from an inflated stock price, stock ownership does not provide sufficient motive to sustain the pleading burden under Rule 9(b).").

As with individual defendants, to properly allege that a corporation had a sufficient motive to commit securities fraud, the complaint must identify a motive not commonly held by all publicly traded companies. *See San Leandro Emergency Med. Group*, 75 F.3d 801, 814 (2d Cir. 1996). In *San Leandro*, the Second Circuit held that an allegation that a corporation had the desire to raise capital cheaply by maintaining a high bond or credit rating does not plead a sufficiently particularized motive. *Id.* Courts have subsequently described "a desire to raise much needed capital" as amongst the broadest, most generalized, and most commonplace motives of corporate motivation for any action. *Glickman v. Alexander & Alexander Servs., Inc.*, 93 Civ. 7594, 1996 WL 88570, at *6 (S.D.N.Y. Feb. 29, 1996).

*In re 1993 Corning Securities Litigation*, 93 Civ. 7015, 1996 WL 257603, at *6 (S.D.N.Y. May 15, 1995), is also instructive. The complaint in that case detailed the defendant corporation's need for additional capital following the acquisition of another corporation. *Id.* The complaint alleged that the defendant corporation issued $100 million of debentures nine days before announcing lower-than-expected earnings. *Id.* The complaint also alleged that the announcement was postponed to prevent damage to the debenture offering and other prospective financing. The court found these allegations "identical to those" in *San Leandro* and dismissed the claim. *Id.* The Second Circuit, relying on *San Leandro*, affirmed in an unpublished opinion. *Adams v. Corning, Inc.*, 112 F.3d 503 (2d Cir. 1997) (table); *see also In re Corning*

*Inc., Sec. Litig.*, 2005 WL 714352 (2d Cir. March 30, 2005)
(unpublished) (corporation's desire to raise funds in securities
offering insufficient).[12]

Plaintiffs make no effort to distinguish *San Leandro*, and
instead rely on *In re American Bank Note Holographics, Inc.
Securities Litigation*, 93 F. Supp. 2d 424, 444-45 (S.D.N.Y. 2000)
[hereinafter "*In re ABN*"]. The *In re ABN* court held that a
plaintiff sufficiently alleged that a parent corporation had a
motive to inflate the appearance of profitability of its
subsidiary where the parent company stood to profit from the
subsidiary's successful IPO. The complaint alleged that the
parent corporation was highly leveraged and suffering from debt
problems. Prior to the IPO, the parent corporation had announced
that it intended to use some of the IPO proceeds to retire some
of its senior debt. *Id.* at 431. The parent was thus allegedly
motivated to make statements or omit facts that would result in a
higher IPO price, which would produce proceeds that it intended
to use to retire its debts. The concrete benefit to the

---

[12] *See also Phillips v. LCT Int'l, Inc.*, 190 F.3d 609, 622 (4th
Cir. 1999) (in merger context, plaintiffs' allegations that a director
sought to depress the stock price to ensure the success of a merger
does not constitute an adequate allegation of motive); *Chill v.
General Elec. Co.*, 101 F.3d 263 (2d Cir. 1996) (motive by parent
corporation to justify its investment in subsidiary to shareholders
not sufficient); *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282,
314-15 (D. N.J. 2001) (allegations that defendants sought to "allay
investor concerns and the Company's primary lender's concerns about
the Company's financial problems" are insufficient because all
companies seek to satisfy investors and lenders that it is financially
sound); *Leventhal v. Tow*, 48 F. Supp. 2d 104, 115 (D. Conn. 1999)
(allegations that defendants inflated stock price to get more
favorable terms in stock-for-stock transactions and debentures are too
generalized).

corporation was to extricate it from its financial crisis. The
*In re ABN* court, however, made no effort to distinguish *San
Leandro* or similar cases and cited no authority for its holding
that motive had been adequately alleged. I therefore find it
unpersuasive.

Finally, plaintiffs make no argument that Leibovitch's
motive has been adequately alleged. Accordingly, plaintiffs have
failed to adequately plead a motive to commit securities fraud
with respect to any defendant.

ii. <u>Strong Circumstantial Evidence of Conscious
Misbehavior or Recklessness</u>

Plaintiffs contend that they have pled strong circumstantial
evidence of conscious misbehavior or recklessness with regard to
the defendants' statements concerning Gilat's assets and
revenues. Gilat allegedly recorded revenue from shipments that
had not yet occurred, from products shipped to third-party
warehouses and stored, and from shipments to uncreditworthy
customers, and failed to disclose that certain revenues were
generated from transactions with related parties, all in
violation of Gilat's purported policy of complying with GAAP.
(*See, e.g.*, ¶ 91.)

Allegations of GAAP violations, by themselves, are not
sufficient to raise a strong inference of recklessness. *Chill*,
101 F.3d at 270; *Stevelman v. Alias Research, Inc.*, 174 F.3d 79,
84 (2d Cir. 1999). The complaint must still supply some factual
basis raising a strong inference that the defendants knew or
should have known that the financial statements were false.

*Rothman*, 220 F.3d at 91. In *Novak v. Kasaks*, for example, the Second Circuit found allegations that a defendants, after discussion, deliberately failed to mark down inventory that was known to be worthless in order to artificially inflate financial results sufficient. 216 F.3d at 311-12. The Court noted that the complaint alleged that the defendants' conduct violated the corporation's own inventory policies. *Id.* at 311. Similarly, in *In re Scholastic Corporation Securities Litigation*, the court held that allegations that the defendants accounting practices were contrary to their stated policy and prior practice, and that the defendants closely monitored the accounts in question was sufficient. 252 F.3d 63, 77 (2d Cir. 2001). Repeated and pervasive GAAP violations may be sufficient to establish the requisite inference. *In re Priceline*, 342 F. Supp. 2d at 57 (nature of GAAP violation probative of scienter); *Lewin v. Lipper Convertibles, L.P.*, 03 CV 1117, 2004 WL 1077930, at *2 (S.D.N.Y. May 13, 2004) (repeated and pervasive GAAP violations can provide strong inference of scienter). In addition, GAAP violations that involve the premature recognition of revenue have been said to "suggest a conscious choice to recognize revenue in a manner improper, and may therefore support a stronger inference of scienter." *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 21 (D.D.C. 2000). This is because premature revenue recognition, unlike other types of GAAP violations, is less likely to be an inadvertent mistake. *Id*. (distinguishing *Chill*, 101 F.3d 263).

The complaint meets this standard. Most significantly, the

complaint alleges that the defendants knowingly deviated from
Gilat's publicly stated policy of adhering to GAAP.  According to
the complaint, CW1 informed Leibovitch, Gilat's Chief Financial
Officer, at the end of Q2 that certain sales to uncreditworthy
customers for whom collection of accounts receivable would be
difficult violated GAAP and Gilat policy.  (¶ 92(c).)  The
complaint alleges that Gat and Leibovitch were well-situated to
be aware of Gilat's faulty accounting practices.  In addition to
being Gilat's CEO, Gat also allegedly occupied an "observer seat"
on the board of directors of rStar, one of Gilat's allegedly
uncreditworthy customers. (¶ 92.)  Accounts receivable owed by
rStar were allegedly not discounted in violation of GAAP.  In
addition, according to CW1, Gat attended quarterly meetings to
discuss accounts receivables that were greater than $500,000.
Gat was therefore aware of the magnitude of the debt and
likelihood of collection.  (¶ 207(a).)  The complaint also
alleges that Gilat's inventory parking scheme required storing
products in third-party warehouses, (*see, e.g.,* ¶ 78(c)), and
that the checks to pay these warehouse fees were signed by Gat,
Leibovitch, or both.  (¶ 78(c).)

Second, the complaint cites numerous sales that allegedly
resulted in improperly recognized revenue.  *See Greebel v. FTP
Softwares*, 194 F.3d 185, 203-04 (1st Cir. 1999) (identifying the
amount of revenue involved, the products involved, dates of
transactions, and identity of customers as relevant to whether
scienter is properly pled with regard to a GAAP violation).  For

example, the complaint provides a detailed description of specific transactions with Dell Computers and Spacenet, allegedly without economic substance. *See, e.g.*, ¶ 77(a). The form of these transactions was allegedly described in an email by Spacenet CFO Bob Dowski to Leibovitch. (¶ 77(a)(iii).) The complaint identifies numerous other transactions with identified customers and dollar values that were allegedly recognized in violation of GAAP. (*See, e.g.*, ¶¶ 78(b), 82(a), 91(b-c) (identifying specific invoices, customers, and dollar values).) And the complaint also alleges that Gilat engaged in several "inventory parking" schemes in violation of GAAP. Such schemes do not commonly occur inadvertently. They instead suggest a conscious decision to improperly recognize revenue. *See Bell v. Fore Sys., Inc.*, 17 F. Supp. 2d 433, 439 (W.D.Pa. 1998).

Third, the complaint alleges that Gilat requested that shippers prepare air waybills without dates to permit recognition of those sales before the product was actually shipped. (¶ 82(a).) This suggests a conscious decision to deviate from GAAP's rules pertaining to revenue recognition. The complaint therefore adequately alleges scienter with respect to statements fifteen through thirty-nine.

## II.  Statute of Limitations

Eight separate complaints were originally filed in this district starting on March 12, 2002, against Gilat on behalf of persons who purchased Gilat stock between August 14, 2000, to

October 3, 2001.  On January 15, 2003, these actions were
consolidated, and Leumi PIA Sector Fund, Leumi PIA World Fund,
and Leumi PIA Export were named lead plaintiffs.  Lead plaintiffs
filed a consolidated class action complaint on May 13, 2003.  The
consolidated complaint expanded the allegations concerning the
scope of the class to include persons who purchased Gilat stock
between the dates of February 9, 2000, and May 29, 2002.
Plaintiffs then filed an amended complaint on August 25, 2004,
which contained additional allegations relating to Gilat's
accounting practices.

Defendants contend: (1) all claims pertaining to GAAP
violations alleged for the first time in the August 25, 2004,
complaint are untimely; and (2) the claims of plaintiffs who
purchased their shares during the expanded class period but not
the original class period are untimely.[13]  Central to the
determination of the timeliness of these allegations is the
applicable statute of limitations, which the parties dispute, and
whether the consolidated complaint and the amendments to the
consolidated complaint relate back to the filing of the original
March 2001 complaints.

Prior to July 30, 2002, claims of securities law violations
made pursuant to Rule 10b-5 were required to be brought "within
one year after the discovery of the facts constituting the

---

[13] This period would include the claims of plaintiffs who
purchased their shares between February 9, 2000 and August 14, 2000,
and the claims of plaintiffs who purchased their shares between
October 3, 2001 and May 29, 2002.

violation and within three years after such violation." *Lampf, Pleva, Lipkind, Prupis and Petigrow v. Gilbertson*, 501 U.S. 350, 364 (1991). The one-year period began to run when the plaintiff either "obtain[ed] actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1042 (2d Cir. 1992). The three-year period of repose ran from the date of the "violation." *Lampf*, 501 U.S. at 363. The violation occurs on the date that the plaintiff, in reliance on the misrepresentation, purchases, or sells the security in question. *Grondahl v. Merritt & Harris, Inc.*, 964 F.2d 1290, 1292 (2d Cir. 1992).

Effective July 30, 2002, the Sarbanes-Oxley Act ("SOA") extended the statutes of limitation by requiring that the complaint be brought not later than the earlier of: 1) two years after the discovery of the facts constituting the violation; *or* 2) five years after such violation. 28 U.S.C. § 1658. Congress further provided that a

> private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(47)) may be brought not later than the earlier of--
>> (1) 2 years after the discovery of the facts constituting the violation; or
>> (2) 5 years after such violation.
> (b) EFFECTIVE DATE.--The limitations period . . . shall apply to all proceedings addressed by this section that are commenced on or after the [July 30, 2002] date of enactment of this Act.

(c) NO CREATION OF ACTIONS.--Nothing in this section shall
create a new, private right of action.

Pub.L. 107-204, § 804(b), 116 Stat. 745, 801.  The parties
dispute whether *Lampf*'s one-year statute of limitations and
three-year statute of repose or the SOA's two-year statute of
limitations and five-year statute of repose apply to this action.

The parties also dispute the date on which these claims
arose.  The statute of limitations with respect to a Rule 10b-5
claim begins to run after the plaintiff "obtains actual knowledge
of the facts giving rise to the action or notice of the facts,
which in the exercise of reasonable diligence, would have led to
actual knowledge."  *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970
F.2d 1030, 1042 (2d Cir. 1992).  The duty of inquiry arises when
circumstances would suggest to an investor of ordinary
intelligence the probability that he or she had been defrauded.
*Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993).
These circumstances are commonly referred to as "storm warnings."
*Id.*  Whether the claim of an investor who receives "storm
warnings" is time-barred turns on exactly how long after the
storm warnings occur, the investor of reasonable diligence would
have discovered the facts underlying the fraud.  *Rothman*, 220
F.3d at 97.  Resolution of this issue is highly factual and
"often inappropriate for resolution on a motion to dismiss under
Rule 12(b)(6)."  *LC Capital Partners*, 318 F.3d at 156 (quoting
*Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363, 367 (7th Cir.
1997)).  The motion may be granted only where the facts needed to
determine when a reasonable investor would have been aware of the

fraud can be discerned from the complaint. *Id.*

Defendants contend that a reasonably diligent plaintiff would have been on notice of the allegedly fraudulent accounting practices by October 2, 2001. Defendants had earlier in the same year announced a "one-time" charge of $29.7 million charge resulting from "impaired investments" and a $48 million charge for bad debts and restructuring. The third charge on October 2 was for $247 million for bad debt reserves, impairment of assets, inventory write off, and restructuring. This third charge, the complaint alleges, resulted in Gilat's share price closing down 38% from the day before. (¶ 165.) Defendants contend that any reasonable investor would be placed on inquiry notice by these charges as a matter of law.

The Court need not decide either which statute of limitations applies or whether the plaintiffs were placed on inquiry notice as of October 2, 2001. Even assuming that defendants are correct on both points, plaintiffs' claims are timely because they relate back to the timely filed original complaints.

A.    Timeliness of GAAP Allegations

On August 25, 2004, the plaintiffs amended their complaint to include additional allegations pertaining to Gilat's accounting practices. Defendants contend that these additional allegations are untimely because the plaintiffs were on notice of their claims by October 2, 2001, and the GAAP allegations do not relate back to the filing of the original complaints, thereby

rendering plaintiffs' claims relating to Gilat's accounting
practices untimely.  Plaintiffs contend that under Federal Rule
of Civil Procedure 15, these allegations relate back to the
filing of the initial complaints in March 2002.

The original complaints alleged accounting improprieties
including the failure to markdown doubtful accounts receivable
and other impaired assets, (*see* complaints in *Frenkel v. Gilat
Satellites,* 02-2769 (E.D.N.Y.); *Albrecht v. Gilat Satellites*, 02-
1617 (E.D.N.Y.), and the exaggeration of revenue and net income
in violation of GAAP, (*see* complaints in *Kriegel v. Gilat
Satellites,* 02-1544; *Frenkel v. Gilat Satellites*, 02-2769).  The
August 25, 2004, amendments elaborated on the plaintiffs'
previously alleged GAAP violations by adding detail concerning
the precise manner in which Gilat's accounting inflated its
revenues and net worth.  In particular, the new allegations were
based on information gathered from Confidential Witness 1 ("CW
1"), a former Gilat Finance Division employee regarding highly
specific means the defendants' employed in circumventing GAAP.

Rule 15(c) provides that "[a]n amendment of a pleading
relates back to the date of the original pleading when . . . (2)
the claim or defense asserted in the amended pleading arose out
of the conduct, transaction, or occurrence set forth or attempted
to be set forth in the original pleading."  The pertinent inquiry
is whether the "general fact situation alleged in the original
pleading" gave the defendants "fair notice" of the new
allegations.  *Stevelman*, 174 F.3d at 86 (quoting *Rosenberg v.*

*Martin*, 478 F.2d 520, 526 (2d Cir. 1973)).

The Second Circuit confronted similar proposed amendments in *Stevelman v. Alias Research, Inc.*, 174 F.3d 79. Stevelman's original complaint alleged that the defendants'

> 'internal controls' had been inadequate and that the defendants knew or should have known, or recklessly did not know, about the accounts receivable problem when they made false and misleading statements of material fact in press releases and SEC disclosure statements, in order to assure investors of continued inflated earnings.

*Id.* at 86. The amended complaint increased the specificity of these allegations and alleged "improper recognition of revenues and failure to establish timely and adequate reserves for doubtful accounts in violation of GAAP and industry standards." *Id.* The Court held that the amendment properly related back because the original complaint clearly put the defendants on notice of the conduct and transactions at issue. *Id.*

In light of *Stevelman*, the plaintiffs' amplified allegations concerning the defendants' practice of inflating revenues and concealing expenses relate back to the filing of the original complaints and are timely. As in *Stevelman*, defendants in this case were on clear notice that their accounting practices were in question, both in recognizing revenue and recording expenses. In particular, they were on notice that plaintiffs' alleged that their accounting practices were fraudulent because they were not in compliance with GAAP.

Accordingly, these amendments relate back to the filing of the original complaints and are timely.

B. New Plaintiffs

I next turn to the claims of the "new plaintiffs" -- that is those claims by shareholders who purchased their stock prior to August 14, 2000, or after October 3, 2001, and were identified for the first time in the consolidated complaint filed on May 13, 2003. The viability of these claims also rests on an application of the statute of limitations and the principles governing the relation back of amended pleadings.

I note, however, that this case has not yet been certified as a class action pursuant to Rule 23, and none of these "new plaintiffs" are named parties to this action. Accordingly, any dispositive ruling regarding the claims of those "new plaintiffs" would not bind them. MANUAL FOR COMPLEX LITIGATION § 21.11, at 246 (4th ed. 2004). At oral argument, defendants stated that they seek to narrow the scope of the class that plaintiffs seek to represent to reduce the burden of discovery. It is apparent, therefore, that instead of seeking to dismiss any claims that are properly before the Court, defendants seek to narrow the scope of the class that plaintiffs seek to represent. Such matters are more appropriately considered in response to plaintiffs' Rule 23 motion to certify a plaintiff class, *see, e.g., In re Worldcom, Inc., Sec. Litig.*, 219 F.R.D. 267, 303-04 (S.D.N.Y. 2003) (existence of statute of limitations defense is one factor to consider in assessing typicality), or in a post-certification motion for summary judgment.

In any event, even if the claims were before the Court, the defendants have not demonstrated that dismissal would be

appropriate.  The Rules of Civil Procedure do not explicitly
provide for relation back of amendments adding new plaintiffs.
Rule 15(c)(2), for example, only pertains to the addition of new
claims or defenses, and Rule 15(c)(3) explicitly concerns only
the addition of new defendants.[14]  Nevertheless, the advisory
committee notes state that "the attitude taken in revised Rule
15(c) toward change of defendants extends by analogy to
amendments changing plaintiffs."  Courts have, however, disagreed
concerning precisely how to apply "the attitude" of Rule 15(c) to
amendments adding new plaintiffs.  *See Olech v. Village of*
*Willowbrook*, 138 F. Supp. 2d 1036 (N.D. Ill. 2000) (discussing
disagreement).  But all courts appear to agree that the defendant
must have had fair notice of the claims against him and have not
suffered undue prejudice.  *See id.; In re Simon II Litig.*, 211
F.R.D. 86, at 145 (E.D.N.Y. 2002).

Some courts impose two additional requirements: (1) that the
plaintiff demonstrate that the failure to plead the claim earlier
was due to "a mistake concerning the identity of the proper

---

[14] Rule 15(c)(2) & (3) permit relation back when:

(2) the claim or defense asserted in the amended pleading arose
out of the conduct, transaction, or occurrence set forth or
attempted to be set forth in the original pleading, or

(3) the amendment changes the party of the naming of the party
against whom a claim is asserted if the foregoing provision (2) is
saitsfied and, within the period provided by Rule 4(m) for service
of the summons and complaint, the party to be brought in by
amendment (A) has received such notice of the institution of the
action that the party will not be prejudiced in maintaining a
defense on the merits, and (B) knew or should have known that, but
for a mistake concerning the identity of the proper party, the
action would have been brought against the party.

[plaintiff]" *see, e.g., Nelson v. County of Allegheny*, 60 F.3d 1010, 1013-15 (3d Cir. 1995); and (2) that the original plaintiffs and the new plaintiffs share an "identity of interests." *See, e.g., Syntex Corp. Sec. Litig.*, 95 F.3d 922, 935 (9th Cir. 1996) (applying a judicially-created equitable test for determining when the claims of new plaintiffs relate back); *see also Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113 (11th Cir. 2004) (discussing two different tests courts apply to determine if the claims of newly added plaintiffs relate back but adopting neither).  Courts in this district have generally rejected the requirement that plaintiffs seeking to add new plaintiffs satisfy Rule 15(c)(3)'s "mistake" requirement.  Judge Weinstein has observed, for example, that "[t]his provision, by its express language, appears not to be relevant when adding a plaintiff." *In re Simon II Litig.*, 211 F.R.D. at 145.  Nor is requiring the plaintiff to demonstrate a "mistake" consistent with the liberal "attitude" of Rule 15, which is to permit amendment of pleadings to encourage resolution of claims on the merits. *See Olech*, 138 F. Supp. 2d at 1043; *In re Simon II*, 211 F.R.D. at 144; 6A WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 1501 (2d ed. 1990).[15]

_____

[15] Defendants rely on *In re Bausch & Lomb, Inc. Sec. Litig.*, 941 F. Supp. 1352, 1364 (W.D.N.Y. 1996), for the proposition that for an amendment to a complaint adding new parties to relate back, the plaintiff must show that the amendment is necessary due to a mistake in the original pleading.  *Bausch & Lomb* is distinguishable because plaintiffs in that case sought to add new defendants as well as new plaintiffs.  *Id.* at 1364.  As noted, the "mistake" requirement is not applicable to the addition of new plaintiffs, *In re Simon II Litig.*,

(continued...)

Nor has this district generally required a strict "identity of interests" between original plaintiffs and newly added plaintiffs. The "identity of interest" requirement apparently stems from Rule 17, which requires that "[e]very action shall be prosecuted in the name of the real party in interest." Motions to *substitute* plaintiffs are frequently brought pursuant to Rule 17. Those courts imposing the "identity of interest" requirement in the context of the addition of new plaintiffs do so to ensure that the defendants had notice of the claims of the new plaintiffs prior to the expiration of the statute of limitations. *See Sherwin Manor Nursing Cent., Inc. v. McAuliffe*, 1997 WL 367368 (N.D. Ill. June 25, 1997); Clif J. Shapiro, Note, *Amendments that Add Plaintiffs Under Federal Rule of Civil Procedure 15(c)*, 50 GEO. WASH. L. REV. 671, 679 (1982).[16]

---

[15](...continued)
211 F.R.D. at 145 (noting that the "mistake" requirement "appears not relevant when adding a plaintiff"), so long as the failure to join the plaintiffs in the original complaint was not a deliberate, tactical decision. *See In re Bennett Funding Group, Inc. Sec. Litig.*, 194 F.R.D. 98, 100 (S.D.N.Y. 2000). *But see Nelson v. County of Allegheny*, 60 F.3d 1010, 1015 (3d Cir. 1995) (requiring that newly added plaintiff demonstrate "mistake" for his claims to relate back).

[16] Defendants contend that amendment was inappropriate because the interests of the newly added plaintiffs are not identical to those of the original plaintiffs. They contend that various plaintiffs purchased and sold their shares at different times and at different prices, and will therefore differ with respect to what they contend would have been Gilat's unmanipulated price. This argument is a variation of what is known as the "seller/purchaser conflict" frequently made in opposition to class certification in securities fraud cases. The argument simply put is that because class members buy and sell from each other, they may also have opposite incentives with regard to proving price inflation. *See generally* Kermit Roosevelt, *Defeating Class Certification in Securities Fraud Actions*, 22 REV. LITIG. 405 (2003); David J. Ross, *Do Conflicts Between Class*

(continued...)

Accordingly, I will consider whether the defendants had adequate notice of the claims of the newly added plaintiffs and whether the late assertion of their claims would "surprise and frustrate reasonable possibilities for a defense." *In re Simon II Litig.*, 211 F.R.D. at 146. Before doing so, I note that courts applying this standard and facing similar amendments that expand the scope of a plaintiff class have permitted relation back. *See Blanchard v. Edgemark*, 94 C 1890, 2000 WL 33223385 (N.D. Ill. May 22, 2000) (permitting relation back of expanded class allegations in a securities fraud class action).

In the present case, the original complaints were filed in March of 2002, thereby placing the defendants on notice that their financial statements and statements concerning StarBand were allegedly fraudulent, that the effect of those fraudulent statements was allegedly reflected in a change in the market price of Gilat stock, and that shareholders widely relied on the market price in making investment decisions. The defendants were on notice that the plaintiff class might rely on statements made as far back as March of 1999. The plaintiffs do not seek

---

[16](...continued)
*Members Vitiate Class Action Securities Fraud Suits?*, 70 ST. JOHN'S L. REV. 209 (1996). This objection goes to the use of the class action in securities litigation generally, and not to the propriety of relating back particular pleading amendments. Plaintiffs have yet to move for class certification. The seller/purchaser conflict is more appropriately addressed at that juncture. For varying approaches to resolving the conflict, compare *In re Seagate Tech. II Sec. Litig.*, 843 F. Supp. 1341 (N.D. Cal. 1994) (discussing conflict and declining to certify a class), with *In re Mutual Sav. Bank Sec. Litig.*, 166 F.R.D. 377, 384 (E.D. Mich. 1996) (collecting cases certifying classes despite conflict and certifying subclasses).

recovery for damages arising from any statements prior to February of 2000.  I therefore conclude that the defendants were afforded adequate notice of the claims in question, and their prospects for a reasonable defense have not been compromised.


III. <u>Section 20(a) of the Exchange Act Claim</u>

Gat and Leibovitch move to dismiss the plaintiffs' second claim for relief, which alleges a violation of Section 20(a) of the Exchange Act based on control person liability.

Section 20(a) provides:

> [e]very person who, directly or indirectly, controls any
> person liable under any provision of this chapter or of any
> rule or regulation thereunder shall also be liable jointly
> and severally with and to the same extent as such controlled
> person to any person to whom such controlled person is
> liable, unless the controlling person acted in good faith
> and did not directly or indirectly induce the act or acts
> constituting the violation or cause of action.

15 U.S.C. § 78t.

Gat and Leibovitch correctly contend that "to make out a prima facie case under § 20(a) of the Exchange Act, a plaintiff must show: (1) a primary violation by the controlled person – in this case Gilat; (2) control by the individual defendants; and (3) that the individual defendants were culpable participants in the fraud.  *Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000).  Gat and Leibovitch contend that dismissal is appropriate because the complaint fails to properly allege a Rule 10b-5 claim.  Because I have concluded that the complaint does adequately allege a primary violation, the defendants' motion to dismiss the Section 20(a) claim is denied.

IV.  <u>Leave to Replead</u>

When a cause of action is dismissed because of a pleading deficiency, a plaintiff is generally permitted to replead, unless repleading would be futile.  *See* FED R. CIV. PRO. 15(a); *In re Aol Time Warner, Inc.*, 2004 WL 992991, at *40.  Complaints dismissed due to a failure to comply with the pleading requirements of Rule 9(b) are "almost always dismissed with leave to amend." *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986).  The Ninth Circuit has held that adherence to the principle of liberal amendment is especially important in the context of the PSLRA because of the unprecedented specificity and detail of pleading that the statute requires.  *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2003); *see also Malhotra v. Equitable Life Assurance Soc'y of the United States*, 264 F. Supp. 2d 299, 311 (E.D.N.Y. 2005).  *Contra In re Champion Enter. Inc., Sec. Litig.*, 145 F. Supp. 2d 871 (E.D. Mich. 2001) (holding that PSLRA restricts a courts ability to permit amendment).  Accordingly, the Court will grant the plaintiffs leave to amend so that they may address the pleading deficiencies set forth in this Memorandum.

<u>Conclusion</u>

For the reasons stated, the defendants' motion to dismiss is granted in part and denied in part.  To the extent the plaintiffs' claims for relief rely on statements 1-4, 6, 8-10, 12-14, 18, and 31, the motion is granted.  To the extent that plaintiffs' claims for relief rely on statements 7-8, 11, 15-17,

19-30, and 32-39, the motion is denied.  The motion is also denied with respect to plaintiffs' claim for relief alleging control person liability.  Plaintiffs' motion for leave to amend the complaint consistent with this memorandum is granted.  Any amendment shall be served and filed within forty five days of the date of this decision.

The Clerk is directed to furnish a filed copy of the within to all parties and to the magistrate judge.

SO ORDERED.

Dated :  Brooklyn, New York

September 19, 2005

_      By:  /s/ Charles P. Sifton (electronically signed)
            United States District Judge