UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
In re: Gilat Satellite Networks, Ltd.,

                                              CV-02-1510
                                              (CPS)

                                              MEMORANDUM
                                              OPINION AND
                                              ORDER

----------------------------------------X

SIFTON, Senior Judge.

        On January 17, 2003, eleven class actions alleging

violations of federal securities laws by Defendants Gilat

Satellite Networks, Ltd. ("Gilat"), Yoel Gat, and Yoav Leibovitch

(collectively "Defendants") were consolidated in this Court and

Leumi PIA Sector Fund, Leumi PIA World Fund, and Leumi PIA Export

Fund were appointed Lead Plaintiffs.[1]  On May 13, 2003, Lead

Plaintiffs filed a Consolidated Class Action Complaint (the

"Original Consolidated Complaint"), alleging against all

Defendants violations of Section 10(b) of the Securities Exchange

Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated under

the Exchange Act, 17 C.F.R. § 240j.10b-5.  The complaint also

alleges against Gat and Leibovitch a violation of Section 20(a)

of the Exchange Act.  Presently before the Court are the parties'

_____

        [1] In 2005, while this case was pending, Leumi PIA, which owns and
manages the three mutual funds referred to herein, was sold to Harel Insurance
Investments Ltd. and is now known as "Harel-PIA Group."  The names of the
individual funds have also changed.  To avoid confusion, the parties
continue to refer to Lead Plaintiffs by their prior names, except where noted.
        On February 12, 2003, Glancy Binkow & Goldberg LLP, Bernstein Liebhard &
Lifshitz, LLP, and Cohen, Milstein, Hausfeld & Toll, P.L.L.C. were appointed
co-lead counsel for Lead Plaintiffs.

joint motions for (1) certification of a settlement class; (2) preliminary approval of a proposed Settlement Agreement; (3) preliminary approval of a Plan of Allocation; (4) approval of the proposed manner and form of Notice to the settlement class and of the proposed Proof of Claim form; and (5) scheduling of a date for a Fairness Hearing to consider final approval of the settlement.[2]  For the reasons set forth below, the motions are granted.

## BACKGROUND

The following facts are taken from the parties' submissions in connection with this motion, as well as this Court's previous opinions in this case.  For purposes of these motions, they are not disputed.

Gilat's Business

Gilat is a provider of products and services for satellite-based communications products and services, including Very Small Aperture Terminal ("VSAT") satellite dishes.  During the relevant time periods, February 10, 2000 through May 31,

---

[2] In December, 2006, the parties filed an identical set of motions on the basis of their original Settlement Agreement.  On January 4, 2007, this Court granted the parties' previous motion for certification of the settlement class but denied without prejudice the motions for preliminary approval of the Settlement Agreement and the Plan of Allocation.  The motions for approval of Notice and to schedule a date for the Fairness Hearing were denied as premature.  As discussed in more detail below, the parties have filed the present motions on the basis of their Amended Settlement Agreement.

2002, Yoel Gat was Gilat's Chief Executive Officer and Yoav Leibovitch was Gilat's Chief Financial Officer.

In January 2000, Gilat formed a joint venture, StarBand, with Microsoft and EchoStar Communications, to provide internet access via satellite dishes. Customers would purchase a VSAT manufactured by Gilat and then pay a monthly fee to receive internet access. The StarBand service was made available to the public in November 2000.

During the relevant time periods, Gilat common stock was traded on the NASDAQ National Market System ("NASDAQ"). From 1997 to 2000, Gilat reported substantial growth in revenues and its stock rose significantly. On February 28, 2000, Gilat stock closed on the NASDAQ at $160.50 a share.

Litigation History and Plaintiff's Complaint

Defendants moved to dismiss the Original Consolidated Complaint on July 15, 2003, and subsequently withdrew that motion to dismiss so that the parties could engage in mediation. After mediation proved unsuccessful, Lead Plaintiffs filed an Amended Consolidated Class Action Complaint (the "Amended Consolidated Complaint") on August 25, 2004 which Defendants moved to dismiss on October 29, 2004. That motion to dismiss was granted in part and denied in part in a Memorandum Opinion and Order dated September 19, 2005.

The portion of the Amended Consolidated Complaint which
survived Defendants' motion to dismiss, again alleges that the
Defendants violated Section 10(b) of the Exchange Act and Rule
10b-5 promulgated thereunder and that defendants Gat and
Leibovitch violated Section 20(a) of the Exchange Act.  More
specifically, Lead Plaintiffs allege that Defendants artificially
inflated Gilat's financial results through deceptive financial
statements which overstated Gilat's revenues.  Although
Defendants purported to follow Generally Accepted Accounting
Principles ("GAAP"),[3] they allegedly inflated reported revenues
in press statements and Securities and Exchange Commission
("SEC") filings through premature revenue recognition, recording
revenue from sales in excess of actual purchases, recognizing
revenue from sales prior to delivering the product to customers,
recognizing revenue from sales to uncreditworthy customers,
recording goods placed on consignment as sold, and engaged in
related-party transactions.  Lead Plaintiffs further allege that
the defendants misrepresented the performance of StarBand and the
market for its services, claiming significant success while there
were allegedly serious problems with the service and in signing
up new subscribers.  The Amended Consolidated Complaint also

---

[3] According to the complaint, "GAAP are those principles recognized by
the SEC and the accounting profession as the conventions, rules, and
procedures necessary to define proper accounting practice at a particular
time." Amended Consolidated Complaint, ¶ 192. 17 C.F.R. § 210.4-01 states that
financial statements filed with the SEC that are not in accordance with GAAP
are presumed to be misleading or inaccurate.

alleges that Defendants failed to disclose that Echostar
Communications had not marketed Starband as promised and that
Starband's lenders had withdrawn a $37 million line of credit and
that the Defendants falsely stated that Gilat's total financial
exposure to Starband would not exceed $75 million.  According to
Lead Plaintiffs, as a result of these materially false and
misleading statements, made between February 10, 2000 and May 31,
2002 (the "Class Period"),[4] they and other class members suffered
damages because they purchased or otherwise acquired Gilat
securities at prices which were artificially inflated.

     After this Court's ruling on the motion to dismiss, the
parties engaged in additional mediation before retired California
Superior Court Judge Daniel Weinstein on June 26 and June 27,
2006.  As a result of that mediation, the parties reached an
agreement on the terms of the settlement.

     On December 1, 2006, the parties moved for (1) certification
of a settlement class; (2) preliminary approval of a proposed
Settlement Agreement; (3) approval of proposed Plan of
Allocation; (4) approval of the proposed manner and form of
Notice to the settlement class and of the proposed Proof of Claim
form; and (5) scheduling of a date for a Fairness Hearing to
consider final approval of the settlement.  On January 4, 2007,

---

[4] As discussed below, the initial alleged fraud is said to have occurred
on February 9, 2000 after the close of the markets.  Accordingly, the Class
Period begins on February 10.

this Court granted that motion in part and denied it in part. *See In re Gilat Satellite Networks, Ltd.*, 2005 WL 2277476 (E.D.N.Y. 2005). Specifically, the motion to certify the settlement class was granted, but the motions to preliminarily approve the Settlement Agreement and the Plan of Allocation were denied without prejudice; the Settlement Agreement and Plan of Allocation failed to sufficiently set forth factual bases for presumptions about the timing of alleged disclosures,[5] contained internal inconsistencies regarding dates and recovery amounts, and provided no explanation for the parties' decision to include a $5 minimum claim amount. The motions for approval of the proposed Notice and for scheduling of a date for a Fairness Hearing were also denied as premature.[6]

The parties then revised the settlement in light of this Court's ruling[7] and now move for the same relief they sought earlier.[8]

---

[5] The timing of the alleged disclosures factors into the amount of inflation remaining in the stock on a particular date, as described below.

[6] In denying those motions, the Court also alerted the parties to minor typographical errors and aspects of the Notice which required clarification, which the parties have addressed in the Amended Notice. In oral arguments on March 15, 2007, the Court noted additional corrections which were required, which the parties have also addressed.

[7] Those aspects of the Amended Settlement Agreement which address the concerns expressed by this Court are noted below.

[8] Although this Court previously granted the motion for certification of a settlement class, the parties revised the class definition slightly in amending the settlement and thus move again for certification.

<u>Amended Settlement Agreement</u>

*I. Members of the Class & Identity of Lead Plaintiffs*

According to the Amended Settlement Agreement, the Class consists of "all persons and entities who purchased or otherwise acquired Gilat common stock between February 10, 2000 and May 31, 2002, inclusive."[9] Amended Stipulation and Agreement of Settlement, ¶ 1(c) ("Amended Settlement").

> Excluded from the Class are Defendants, members of the immediate family of each of Defendants, any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party. "Related to or affiliated with" means all companies, subsidiaries, joint ventures, joint subsidiaries, or other entities controlled by any Defendant, or any entity that is or was under common corporate ownership or control with any Defendant.

*Id.*

Lead Plaintiffs in this case are three mutual funds, managed by Harel-PIA Group, Israel's longest established mutual fund management company, representing more the $3 billion in assets. Harel-PIA Group is owned by Harel Insurance Investments Ltd., a publically traded Israeli insurance company. The three

---

[9] In the Plan of Allocation, the parties note that:

Common stock (and other securities) may be acquired by means other than purchase on the open market. Examples of other methods of acquisition include acquiring stock through by exercising warrants or stock options, or acquiring stock through an employer stock distribution.

Amended Notice of Proposed Settlement, n.1 ("Amended Notice").

funds who serve as Lead Plaintiffs manage between $7 million and $17.5 million in assets each.

None of these three funds owned Gilat stock at the beginning of the Class Period and they each purchased and sold shares during several of the time periods described in the Plan of Allocation below.[10]  Exhibit A annexed to the Declaration of Michael Civer (filed with the December 2006 motion) reflects that Leumi PIA World Fund purchased 87,950 shares of Gilat stock during periods 1, 3 and 4 and sold stock during periods 1, 3 and 4; the fund sold all its stock before the end of the Class Period. Civer Declaration, ¶ 6, Exhibit A.  Leumi PIA Export Fund purchased 11,000 shares of Gilat stock during period 1, sold 4,000 shares during period 1 and held the remainder until after the end of period 5. *Id.*  Leumi PIA Sector Fund purchased 6,000 shares during period 1 and sold all of its shares during period 3. *Id.*[11]  Lead Plaintiffs will not receive any compensation or recovery under the settlement for acting as Lead Plaintiffs.

---

[10] The time periods, detailed below, are (1) February 10, 2000 through March 9, 2001 at 2:40 P.M.; (2) March 9, 2001 after 2:40 P.M. through March 11, 2001; (3) March 12, 2001 through October 2, 2001; (4) October 3, 2001 through May 31, 2002; and (5) the 90 period after the end of the Class Period, beginning May 31, 2002 and ending August 28, 2002.

[11] On the basis of the damages estimated in the Plan of Allocation filed with the December 2006 motion, Lead Plaintiffs estimated that the total combined recognized losses for the three funds would total $389,7000, though the actual recovery under the settlement will depend on the ratio of their recognized claims as compared to all other recognized claims, and is likely to be significantly lower. Lead Plaintiff's have not submitted a revised estimate with their current motion.

II. *Released Parties*

Under the terms of the Settlement Agreement, the "Released Parties" are:

> any and all of Defendants and their respective present and former affiliates, predecessors, successors, and assigns, and each of their respective family members, heirs, executors, and administrators, and any corporate entity affiliated with any of the Defendants, including, but not limited to, Gilat, and its presents and former officers, directors, employees, partners, principals, trustees, attorneys, auditors, accountants, investment bankers, consultants, agents, insurers and co-insurers and each of their respective heirs, executors, administrators, predecessors, successors (including, but not limited to, successors in bankruptcy) and assigns.

Amended Settlement, ¶ 1(q).

III. *Claims Administrator*

Lead Plaintiffs' counsel have proposed Garden City Group, Inc. ("GCG") as their Claims Administrator to provide notice and process claims. GCG has been in the business of administering class action settlements for twenty years and has administered hundreds of class action settlements, including several well-known securities settlements. First Affidavit of Shandarese Garr, ¶ 2-3 ("Garr First Affidavit") (attached to December 2006 motion).[12] The firm has experience handling international aspects of class action settlements, and it has in the past

---

[12] The securities class action settlements administered by GCG include *Worldcom Securities Litigation* and *Nortel Networks Corp. Securities Litigation*.

provided such services as toll-free numbers and websites which accommodate non-English speakers. *Id.*, ¶ 6. The firm strives to complete all work and provide final reports within six months of the claims-filing deadline and sees no reason why it could not adhere to that timeline in this case. *Id.*, ¶ 8.

Lead Plaintiffs' counsel selected GCG after reviewing the available options. All three firms have had favorable experiences with GCG in prior securities settlements and have found that "GCG provides professional and high quality work, at competitive rates." Declaration of Daniel Sommers, ¶ 8 ("Sommers Declaration") (attached to December 2006 motion).[13]

IV. *Settlement Fund*

Under the Settlement Agreement, Defendants have agreed to pay $20 million to the Class ("Gross Settlement Fund"), in exchange for release of all claims "arising out of, based upon or related to the purchase of Gilat common stock during the Class Period and that facts, transactions, events, occurrences, acts, disclosures, statements, omissions or failures to act that were alleged in Action." Amended Settlement, ¶ 1(r), 5(a), 5(b). After accounting for (1) any taxes on the income from the

---

[13] The parties note that while GCG's rates are "not necessarily the lowest among claims administrators," they are reasonable and justified by the quality of the work. GCG has also submitted a document listing "Standard Hourly Billing Rates," though no estimated total cost for their services in this matter has been provided. Garr First Affidavit, Exhibit A.

Settlement Fund, (ii) the notice and administrative costs of settlement, (iii) attorneys' fees and expenses awarded by this Court, and (iv) additional administrative expenses, the "Net Settlement Fund" will be distributed according to the Plan of Allocation among Class members who do not opt-out of the settlement and who submit valid proofs of claim. *Id.*, ¶ 7, 13-16.

Under the Settlement Agreement, Lead Plaintiffs' counsel may expend, without further approval from the Court, up to $300,000 from the Gross Settlement Fund to pay the reasonable costs and expenses associated with identifying Class members, publishing, printing and mailing notice and the administrative fees charged by the Claims Administrator in connection with providing notice and processing submitted claims. *Id.*, ¶ 8. Lead Plaintiffs' counsel will also apply to the Court for an award of attorneys fees of up to 30% of the Gross Settlement Amount and reimbursement of expenses, also payable from the Gross Settlement Amount; these fees and expenses are to be allocated among counsel in proportion to their respective contributions to the prosecution and resolution of this suit. *Id.*, ¶ 9. According to Lead Plaintiffs, expenses of approximately $600,000 have been incurred to date. Amended Notice of Proposed Settlement, ¶ 8 ("Amended Notice").

*V. Amended Plan of Allocation*

The Amended Plan of Allocation proposed by the Lead Plaintiffs is set out in the Amended Notice of Proposed Settlement and was prepared with the assistance of a damages consultant, Michael Marek, CFA. *See* Declaration of Michael Marek.[14] The Plan of Allocation "reflects the Lead Plaintiffs' allegations that the price of Gilat's common stock was inflated artificially during the Class Period." Amended Notice, ¶ 38. According to Lead Plaintiffs, the artificial inflation had begun by February 10, 2000 and Gilat's stock remained inflated throughout the Class Period, until May 31, 2002. *Id.* However, at certain times during the Class Period, Gilat made disclosures which partially revealed the alleged fraud and caused the stock price to fall, thereby reducing the amount of artificial inflation caused by the allegedly false and misleading statements. Accordingly, the Plan of Allocation identifies five different time periods and allocates damages on the basis of the amount of artificial inflation remaining in the stock price during each of these periods. "Each Authorized Claimant shall be allocated a pro rata share of the Net Settlement Fund based on his, her or its Recognized Claim as compared to the total Recognized Claims of all Authorized Claimants." *Id.*, ¶ 41.

---

[14] The Plan of Allocation "is not a necessary term" of the Settlement Agreement and "[r]eversal of any plan of allocation approved by the Court shall not constitute grounds for terminating the Settlement and shall not act to terminate the Settlement." Amended Settlement, ¶ 14.

1) Time Period 1: February 10, 2000 - March 9, 2001 at 2:40 PM

According to the Amended Consolidated Complaint, after the close of the markets on February 9, 2000, Bloomberg reported on comments made by Gat at a conference regarding StarBand's business prospects which were "materially false and misleading." Amended Consolidated Complaint, ¶¶ 66-67; see also Marek Declaration, ¶ 5. Accordingly, the relevant Class Period begins on February 10, the first trading day after the allegedly false statements.[15]

"The first alleged partial disclosure of fraud occurred on March 9, 2001, when Defendants revealed that a previously announced initial public offering of StarBand stock would not proceed." Amended Notice, ¶ 38. According to the parties' damages consultant, the disclosure was made at 2:40 P.M. EST. Marek Declaration, ¶ 7. For stock purchased before 2:40 P.M. on March 9, 2001 the damages consultant concluded that the price of Gilat stock was inflated by $16.62 per share.[16] Therefore

> for common stock purchased prior to 2:40 p.m. EST on
> March 9, 2001 and held through the end of the Class
> Period, the Plan of Allocation provides for a maximum

---

[15] The parties revised this date from February 9 to February 10 in response to this Court's concerns about the relationship between the timing of the disclosure and the beginning of the Class Period.

[16] The parties included this revised time and date and detail about the timing of the disclosure in response to this Court's concerns regarding a factual basis for the Plan's presumptions.

> Recognized Loss of $16.62.[17]  For stock sold earlier
> than the end of the Class Period, and thus before the
> full amount of alleged inflation had gone out of the
> stock, the Recognized Loss will be lower than the
> maximum.[18]

Amended Notice, ¶ 38.  Since some Class Members will be unable to

prove the time at which they purchased their Gilat stock on that

day, the stock price of $32.875 will be used as a proxy under the

Plan, since $32.875 was the price per share of the last trade

prior to the 2:40 PM disclosure.  Trades at or above $32.875 will

be deemed to have occurred prior to 2:40 PM and trades below that

amount will be deemed to have occurred after 2:40 PM. *Id.*, n.6.[19]


2)  Time Period 2: March 9, 2001 after 2:40 P.M. - March 11,

2001[20]

Gilat's stock price fell on March 9 after the disclosure at

2:40 P.M. and, according to the damages consultant, $1.19 of the

decline was attributable to the StarBand announcement of March 9,

leaving $15.43 of artificial inflation in the stock. Amended

Notice, ¶ 38.

---

[17] The Recognized Loss is "a calculation of a particular Authorized
Claimant's losses that are recognized as compensable in some measure under the
Settlement." Notice, ¶ 37.

[18] The calculation of loss is set forth in more detail below.

[19] According to the damages consultant, 99% of trades above $32.875 were
made prior to 2:40 PM. Marek Declaration, ¶ 10.

[20] There was no trading on March 10 or March 11.

> Accordingly, for purchases after 2:40 p.m. EST on March 9, 2001 but prior to March 12, 2001, and held through the end of the Class Period, the Plan of Allocation provides for a maximum Recognized Loss of $15.43. For stock sold earlier than the end of the Class Period, and thus before the full amount of alleged inflation had gone out of the stock, the Recognized Loss will be lower than the maximum.

*Id.*

3)  Time Period 3: March 12, 2001 – October 2, 2001

According to Lead Plaintiffs, the alleged fraud was further partially revealed on March 12, 2001, prior to the opening of the market,[21] "when Defendants announced downwardly-revised earnings guidelines for Gilat," leading to a further decline in Gilat's stock price, $13.10 of which was attributable to that disclosure; as a result, Gilat's stock price after the disclosure was inflated by $2.33. *Id.*

> Accordingly, for purchases on or after March 12, 2001 but before October 3, 2001 and held through the end of the Class Period, the Plan of Allocation provides for a maximum Recognized Loss of $2.33. For stock sold earlier than the end of the Class Period, and thus before the full amount of alleged inflation had gone out of the stock, the Recognized Loss will be lower than the maximum.

*Id.*

---

[21] The press release disclosing this information was at 8:57 A.M. EST. Marek Declaration, ¶ 12. The parties included this information in response to this Court's concerns regarding a factual basis for the Plan's presumptions.

4) Time Period 4: October 3, 2001 - May 31, 2002

According to Lead Plaintiffs, Defendants made additional

disclosures on October 2, 2001, after the close of the markets,[22]

announcing that Gilat would take "tens of millions of dollars in

charges and make an additional bad debt reserve of $10 million."

*Id*.  After this disclosure, the remaining $2.33 in inflation was

removed from the stock.  However, the disclosure allegedly

contained an additional misstatement which caused a new inflation

of $0.30. *Id*.

> Accordingly, for common stock purchased on or after
> October 3, 2001 but on or before May 31, 2002, and held
> through the end of the Class Period, the Plan of
> Allocation provides for a maximum Recognized Loss of
> $0.30.[23]  For stock sold earlier than the end of the
> Class Period, and thus before the full amount of
> alleged inflation had gone out of the stock, the
> Recognized Loss will be lower than the maximum.

*Id*.


5) Time Period 5: May 31, 2002 - August 28, 2002

According to Lead Plaintiffs, the final disclosure occurred

---

[22] The press release disclosing this information was at 5:53 P.M. EST.
Marek Declaration, ¶ 15.  The parties included this information about the
timing of the disclosure in response to this Court's concerns regarding a
factual basis for the Plan's presumptions.

[23] In the original Plan of Allocation, the maximum Recognized Loss for
this period was 25% of the purchase price. The parties have changed this to
$0.30 based on the damages consultant's revised measurement. Marek
Declaration, ¶ 19.

on May 31, 2002,[24] when Defendants filed a Form 20F with the
S.E.C. which announced "increased reserves for uncollectible
accounts receivables." *Id*.[25]  Accordingly, "no purchases after
this date are recognized under the Plan of Allocation." *Id*.  In
addition, the Plan of Allocation reflects a limitation on damages
in securities cases imposed under the Private Securities
Litigation Reform Act ("PSLRA"), limiting recovery for Class
Members who sold after the close of the Class Period, namely May
31, 2002.[26] See 15 U.S.C. § 78u-4.  Under the Plan, recovery on
stock sold between May 31, 2002 and August 28, 2002 may be no
greater than the purchase price of the stock minus the average
trading price of the stock between May 31, 2002 and the date of
sale.  Recovery for stock sold after August 28, 2002 may be not
exceed the purchase price of the stock minus the 90-day mean
trading price of $0.95. *Id*., n.8.

---

[24] In the original Plan of Allocation, the parties listed May 29, 2002
as the date of final disclosure.  They have corrected the date on the basis of
the investigation of the damages expert. Marek Declaration, ¶ 18. In so doing,
the parties have also corrected inconsistencies in the Plan dates identified
by the Court.

[25] The time of the filing is not available, but since such filings are
normally submitted after the close of business and the price decline on Gilat
stock did not occur until the next trading day, the damages consultant
concluded that the disclosure occurred after the close of trading on May 31.
Id., ¶ 19.

[26] Under the PSLRA, plaintiff's damages are limited in securities class
actions by the mean stock trading price for the 90-day period (the 'lookback'
period) subsequent to the corrective disclosure - recovery cannot be greater
than the purchase price minus the mean trading price during the lookback
period. Similarly, if a party sold the stock during that same 90-day period,
the damages may not exceed the difference between the purchase price and the
mean trading price of the security from the date of disclosure until the date
of sale.

The Plan of Allocation also provides that transactions resulting in recognized gains will be excluded from the calculation of the net Recognized Claim; the costs/proceeds associated with securities purchased or sold by reason of having exercised an option or warrant shall be incorporated into the price accordingly; shares originally sold short shall have a Recognized Claim of $0; and no payments will be made on a claim where the potential distribution is less than $5.00. Amended Notice, ¶ 40.

In summary, the Plan of Allocation establishes the following claim calculations.  For authorized claimants who purchased stock between February 10, 2000 and March 9, 2001 at 2:40 P.M., inclusive, claims will be calculated as follows:

(1) for stock retained until the end of trading on August 28, 2002, the Recognized Loss shall be the lesser of (a) $16.62 per share or (b) the difference between the purchase price per share and $0.95;

(2) for stock sold between February 10, 2000 and 2:40 P.M. on March 9, 2001, inclusive, there shall be no Recognized Loss;

(3) for stock sold after March 9, 2001 at 2:40 P.M. but prior to March 12, 2001, the Recognized Loss shall be the lesser of (a) $1.19 per share or (b) the difference between the purchase price per share and the sales price per share;

(4) for stock sold between March 12, 2001 and October 2,

2001, inclusive, the Recognized Loss shall be the lesser of (a) $14.29 per share or (b) the difference between the purchase price per share and the sales price per share;[27]

(5) for stock sold between October 3, 2001 and May 31, 2002, inclusive, the Recognized Loss shall be the lesser of (a) $16.32 per share or (b) the difference between the purchase price per share and the sales price per share;

(6) for stock sold between June 1, 2002 and August 28, 2002, inclusive, the Recognized Loss shall be the lesser or (a) $16.62 per share, (b) the difference between the purchase price per share and the sales price per share or (c) the difference between the purchase price per share and the mean closing price of Gilat common stock between May 31, 2002 and the date of sale. Amended Notice, ¶ 39(a).

For authorized claimants who purchased stock on after 2:40 P.M. on March 9, 2001 but before March 12, 2001, claims will be calculated as follows:

(1) for stock retained until the end of trading on August 28, 2002, the Recognized Loss shall be the lesser of (a) $15.43 per share or (b) the difference between the purchase price per share and $0.95;

(2) for stock sold on March 9, 2001, there shall be no

---

[27] The parties have corrected the original Plan which inconsistently calculated this amount as $14.29 in some places and $14.28 in others.

Recognized Loss;

(3) for stock sold between March 12, 2001 and October 2, 2001, inclusive, the Recognized Loss shall be the lesser of (a) $13.10 per share[28] or (b) the difference between the purchase price per share and the sales price per share;

(4) for stock sold between October 3, 2001 and May 31, 2002, inclusive, the Recognized Loss shall be the lesser of (a) $15.13 per share or (b) the difference between the purchase price per share and the sales price per share;

(5) for stock sold between June 1, 2002 and August 28, 2002, inclusive, the Recognized Loss shall be the lesser or (a) $15.43 per share, (b) the difference between the purchase price per share and the sales price per share or (c) the difference between the purchase price per share and the mean closing price of Gilat common stock between May 31, 2002 and the date of sale. Amended Notice, ¶ 39(b).

For authorized claimants who purchased stock between March 12, 2001 and October 2, 2001, inclusive, claims will be calculated as follows:

(1) for stock retained until the end of trading on August 28, 2002, the Recognized Loss shall be the lesser of (a) $2.33 per share or (b) the difference between the purchase price per

---

[28] The parties have corrected the original Plan which inconsistently calculated this amount as $13.10 in some places and $13.09 in others.

share and $0.95;

(2) for stock sold between March 12, 2001 and October 2, 2001, inclusive, there shall be no Recognized Loss;

(3) for stock sold between October 3, 2001 and May 31, 2002, inclusive, the Recognized Loss shall be the lesser of (a) $2.03 per share or (b) the difference between the purchase price per share and the sales price per share;

(4) for stock sold between June 1, 2002 and August 28, 2002, inclusive, the Recognized Loss shall be the lesser or (a) $2.33 per share, (b) the difference between the purchase price per share and the sales price per share or (c) the difference between the purchase price per share and the mean closing price of Gilat common stock between May 31, 2002 and the date of sale. Amended Notice, ¶ 39(c).

For authorized claimants who purchased stock between October 3, 2001 and May 31, 2002, inclusive, claims will be calculated as follows:

(1) for stock retained until the end of trading on August 28, 2002, the Recognized Loss shall be the lesser of (a) $0.30 per share or (b) the difference between the purchase price per share and $0.95;

(2) for stock sold between October 3, 2001 and May 31, 2002, inclusive, there shall be no Recognized Loss;

(3) for stock sold between June 1, 2002 and August 28,

2002, inclusive, the Recognized Loss shall be the lesser or (a)

$0.30 per share, (b) the difference between the purchase price

per share and the sales price per share or (c) the difference

between the purchase price per share and the mean closing price

of Gilat common stock between May 31, 2002 and the date of sale.

Amended Notice, ¶ 39(d).


**DISCUSSION**

Certification of Amended Settlement Class

In accordance with Federal Rule of Civil Procedure 23, this

Court previously approved the settlement class in the January 4,

2007 Memorandum Opinion and Order, holding that the class met the

numerosity, commonality, typicality requirements, that the

representation was adequate and that common questions of law and

fact predominate over individual questions.[29]  The parties now

---

[29] Federal Rule of Civil Procedure 23(a) sets forth the requirements for
class certification:

> One or more members of a class may sue or be sued as
> representative parties on behalf of all only if (1) the class is
> so numerous that joinder of all members is impracticable, (2)
> there are questions of law or fact common to the class, (3) the
> claims or defenses of the representative parties are typical of
> the claims or defenses of the class, and (4) the representative
> parties will fairly and adequately protect the interests of the
> class.

In addition, for a class action to be maintainable, it must satisfy one of the
subsections of Federal Rule of Civil Procedure 23(b).  In the present action,
Rule 23(b)(3) is applicable.  Rule 23(b)(3) requires that a court find:

> that the questions of law or fact common to the members of the class
> predominate over any questions affecting only individual members,
> and that a class action is superior to other available methods for
> the fair and efficient adjudication of the controversy.

move for an order certifying the amended class.  Since the only
material changes to the class definition are the corrected dates
of the Class Period (from February 10, 2000 until May 31, 2002),
I certify the amended settlement class for the same reasons as
set out in my prior Order.


Preliminary Approval of Settlement & Plan of Allocation

        Preliminary approval of a proposed settlement is
appropriate where it is the result of serious, informed, and
non-collusive negotiations, where there are no grounds to doubt
its fairness and no other obvious deficiencies (such as unduly
preferential treatment of class representatives or of segments of
the class, or excessive compensation for attorneys), and where
the settlement appears to fall within the range of possible
approval. Manual for Complex Litig. § 30.41; *In re Med. X-Ray
Film Antitrust Litig.*, at *6.

        Addressing the Court's previously expressed concerns, the
Amended Plan of Allocation sets forth factual bases for the times
and dates of the alleged disclosures by Defendants and revises
the beginning and ending dates of the five time periods
accordingly. *See* Marek Declaration.  Further, using the stock
price as of 2:40 P.M. on March 9, 2001, as a proxy for the time
of purchase and sale is a reasonable and workable solution to the

problem of determining when the stock was traded on that date.
*See In re American Bank Note Holographics*, Inc., 127 F.Supp.2d
418, 429-30 (S.D.N.Y. 2001) ("An allocation formula need only
have a reasonable, rational basis, particularly  if recommended
by 'experienced and competent' class counsel).  In addition, the
parties' have adequately responded to this Court's concern
regarding the minimum claim amount.  The Plan states that "no
cash payments will be made on a Recognized Claim where the
potential distribution amount is less than $5.00." Amended
Notice, ¶ 40(e).[30]  As noted by the parties, *de minimus*
thresholds for payable claims are beneficial to the class as a
whole since they save the settlement fund from being depleted by
the administrative costs associated with claims unlikely to
exceed those costs and courts have frequently approved such
thresholds, often at $10. *See* Second Garr Affidavit (attached to
the current motion); *In re Global Crossing Securities and ERISA
Litigation*, 225 F.R.D. 436, 463 (S.D.N.Y. 2004) (approving a $10
threshold and noting that "[c]lass counsel are entitled to use
their discretion to conclude that, at some point, the need to
avoid excessive expense to the class as a whole outweighs the
minimal loss to the claimants who are not receiving their de

---

[30] The Court's understanding of this clause is that claims which, under
the optimal distribution scenario, are worth less than $5 will not be paid
out. However, claims which are potentially worth more than $5 but, after the
allocations have been determined are worth less in practice, will be paid out.

minimis amounts of relief"). In this case, the parties have agreed to a $5 threshold, which is reasonable to "preserve the settlement fund from excessive and unnecessary expenses in the overall interests of the class as a whole." *In re Global Crossing Securities and ERISA Litigation*, 225 F.R.D. at 463. Under the Amended Settlement, those class members with such *de minimus* claims may choose to opt out from the class as set forth in the Amended Notice.[31]

As I explained in my January 4, 2007 Opinion, with these changes, the Settlement Agreement meets the standards required for preliminary approval. The proposed settlement here does not appear to be collusive, given the lengthy negotiations surrounding it and the involvement of a third-party mediator with experience in similar types of actions in establishing the settlement framework. Weinstein Declaration, ¶ 1, 7; *see In re Indep. Energy Holdings PLC,* 2003 WL 22244676, at *4 (S.D.N.Y. 2003) ("the fact that the Settlement was reached after exhaustive arm's-length negotiations, with the assistance of a private 'mediator experienced in complex litigation, is further proof that it is fair and reasonable"). Judge Weinstein has stated that "each party was ably and aggressively represented in [the] negotiations." Weinstein Declaration, ¶ 6. He has further stated

---

[31] The parties have also corrected the typographical errors and confusing aspects of the Notice which I noted in my previous opinion and at oral arguments on March 15, 2007.

that the parties prepared detailed mediation briefs detailing the facts, law and damages as they saw them and that he "can attest to vigorous, thorough and reasonable negotiations, and to the arms-length nature of the mediation process," which led to a settlement that was "fair and reasonable." *Id.*, ¶ 8.  While Lead Plaintiffs' counsel has indicated the fees it intends to request from the Court should the settlement be approved, the settlement explicitly provides that any order relating to the application for fees "shall not operate to terminate or cancel the Stipulation or the Settlement." Amended Settlement, ¶ 9.  In addition, there is no unduly preferential treatment to class representatives, who will receive no additional compensation from the settlement for their role as Lead Plaintiffs.

Further, in terms of the overall fairness, adequacy, and reasonableness of the settlement, a full fairness analysis is unnecessary at this stage; preliminary approval is appropriate where a proposed settlement is merely within the range of possible approval.  I note, however, that the factors to be considered in such an analysis include: (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial,

(7) the ability of the defendants to withstand a greater
judgment, (8) the range of reasonableness of the settlement fund
in light of the best possible recovery, and (9) the range of
reasonableness of the settlement fund to a possible recovery in
light of all the attendant risks of litigation. *City of Detroit
v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). Clearly,
some of these factors, particularly the reaction of the class to
the settlement, are impossible to weigh prior to notice and a
hearing.

At this stage, brief consideration of these factors leads to
the conclusion that the proposed relief awarded to Class Members
under the Amended Settlement Agreement and Amended Plan of
Allocation is within the range of possible approval. Securities
class actions are generally complex and expensive to prosecute.
*See In re Sumitomo Copper Litig.,* 189 F.R.D. 274, 283 (S.D.N.Y.
1999) (Proof of damages is "particularly risky. . . in commodity
price manipulation cases"). In this case, the costs of
litigating are anticipated to be "extremely high," since both
Gilat and the companies with which Gilat did business under the
allegedly fraudulent scheme are located overseas, which will
increase the cost and complexity of discovery. First Memorandum
in Support, P.12; *see Schwartz v. Novo Industri A/S,* 119 F.R.D.
359, 363 (S.D.N.Y. 1988) (weighing the complications of discovery
with a foreign defendant in favor of settlement). In addition,

the parties state that if the case were litigated and Plaintiffs'
prevailed, "Defendants certainly would . . . appeal[] the
verdict," adding further delay and expense. First Memorandum in
Support, P.12; *see In re Am. Bank Note Holographics, Inc.,* 127
F.Supp.2d 418, 425 (S.D.N.Y. 2001) ("Add on time for a trial and
appeals, and the class would have seen no recovery for years.
Class counsel properly considered this factor as well").  The
parties have also spent significant time investigating the legal
and factual issues in this case and appear to be well informed as
to the operative facts of this case, which is already four years
old.  Although little formal discovery has been completed, Lead
Plaintiffs have interviewed several former employees of Gilat and
obtained a number of internal documents, and both parties have
conducted "extensive research" in connection with their briefings
on the Defendants' motion to dismiss and in preparation for
mediation. First Memorandum in Support, P.13; Amended
Consolidated Complaint, ¶¶ 42-51; Weinstein Declaration, ¶¶ 3, 6.
As for the risks of establishing liability and damages, they are
considerable in this case.  Lead Plaintiffs will have to
establish that the Defendants acted with a culpable state of
mind, "a difficult burden to meet," *Adair v. Bristol Tech. Sys.,*
*Inc.,* 1999 WL 1037878, at *2 (S.D.N.Y. 1999), especially in this
case where, apparently, neither the individual defendants nor any
other Gilat executive profited from their Gilat investments,

creating substantial difficulty in establishing a motive.   In
addition, while Lead Plaintiffs allege that the most significant
stock decline, which occurred on March 12, 2001, was related to
Gilat's financial announcement of that day, Defendants
"vigorously dispute this" and claim instead that the stock
decline was related to prior announcements and, moreover, that
the announcement of March 12 did not reveal any fraud. First
Memorandum in Support, P.14.   Accordingly, it is highly uncertain
whether Lead Plaintiffs will be able to demonstrate loss
causation related to the March 12 announcement, which would
impact the vast majority of the damages allegedly suffered by the
Class.   Additionally, at trial, Defendants would likely introduce
their own expert to contest Lead Plaintiffs' allegations as to
the causes of the stock price declines on the other dates as
well.   Accordingly, although Lead Plaintiff's counsel appears
capable of litigating this case, there are obvious doubts as to
the merits of the case that may make it difficult for them to do
so.   The relationship of the settlement fund to the best possible
recovery or the potential recovery in light of all the risks of
litigation also weighs in favor of approving the settlement.   As
stated above, Defendants have agreed to contribute $20 million to
the Gross Settlement Fund; after attorney's fees and other costs
associated with this action, the Net Settlement Fund will likely
be in the range of $12 million to $13 million.   Though the

parties have not provided the Court with an estimate of the total

potential recovery should the case go to trial, given the risks

involved in proving liability and damages, were this case to

proceed to trial there is a significant possibility that the

Class would recover nothing.  Finally, the parties have provided

a sufficient factual basis for the time periods and damages

amounts specified in the Amended Plan of Allocation and

established a reasonable formula for allocating recovery to Class

Members on the basis of each Class Member's injury.[32][33]  Given the

risks and costs involving in litigating this matter, and the

reasonableness of the allocation formula, the relief awarded to

Class members under the Amended Settlement Agreement and the

---

[32] The parties have also submitted to the Court, under seal, the
Supplemental Agreement referred to in § 30 of the Amended Settlement Agreement
regarding the conditions under which Defendants may terminate the Settlement
if Class Members who purchased in excess of a certain number of shares exclude
themselves from the Class.  The Court has reviewed the agreement and finds it
reasonable.

[33] The Plan applies the PSLRA's 90-day 'lookback' period for averaging
the sales price only to sales made after the final disclosure.  While this
creates a somewhat inconsistent scheme, it does not appear unreasonable for
the purposes of preliminary approval, especially considering the fact that the
PSLRA does not apply to settlements.  *See In re Veritas Software Corp.
Securities Litigation*, 2005 WL 3096079, at *10 (N.D.Cal. 2005).  Similarly,
the Plan may allow for some overcompensation of those Claimants who sold stock
immediately after disclosure but before the entire amount of deflation had
gone out of the stock.  Given the complexity in determining the point after
which deflation was fully accounted for, the Plan of Allocation reasonably
caps recovery at Marek's estimated amount of deflation, even though that may
allow for isolated cases of overcompensation.  In addition, it is arguable
that the 90-day lookback period for the PSLRA should begin on June 3, 2002,
the first trading day after the final disclosure.  However, since the PSLRA
states that the 90-day period begins "on the date on which the information
correcting the misstatement or omission that is the basis for the action is
disseminated to the market," the parties' interpretation that the period
should begin on May 31, 2002 (the date of the final disclosure) is not
unreasonable. 15 U.S.C. § 78u-4(e)(1).

Amended Plan of Allocation is within the range of possible
approval required for preliminary approval. Accordingly,
preliminary approval of the Amended Plan of Allocation and
Amended Settlement Agreement is granted.

Notice

Under Rule 23(c)(2), this Court is to direct to the members
of the class "the best notice practicable under the
circumstances, including individual notice to all members who can
be identified through reasonable effort." Fed R. Civ. P.
23(c)(2); *see also Eisen v. Carlisle and Jacquelin*, 417 U.S. 156,
173 (1974). The form of notice must fairly apprise the
prospective members of the class of the pendency of the class
action, the terms of the proposed settlement, and the options
that are open to them in connection with the proceedings,
including the option to withdraw from the settlement. *See
Weinberger v. Kendrick*, 698 F.2d 61, 70-71 (2d Cir. 1982).

The proposed Amended Notice in this case contains all the
necessary information, including a description of the Class, a
summary of settlement terms, the Plan of Allocation and
procedures for objections and opt-outs. The parties propose to
provide notice by mailing the Amended Notice, along with the
Proof of Claim form, to each Gilat shareholder of record (as
provided by Gilat's transfer agent) and to a list of more than

2500 of the largest banks, brokerages, and other nominees which has been complied by GCG and used in previous class action settlements. These nominees are required to identify clients who are members of the Class and either mail notices to those Class Members or forward their contact information to GCG, which will then mail them the Amended Notice and Proof of Claim form. According to Lead Plaintiff's counsel and GCG, this manner of notice is standard and effective in securities class actions.

In addition, a Summary Notice will be published once in the *Wall Street Journal* and three Israeli Newspapers: *Ha'aretz*, the *Globe*, and the *Jerusalem Post*. The Summary Notice provides both a telephone number to contact and a web site where potential Class Members can obtain more information. It will also include a brief description of the Class, the date of the Fairness Hearing, and notice as to the binding nature of the settlement and how Class Members may either opt-out or file a claim. The Amended Notice and Proof of Claim form will also be available on GCG's web site and a toll-free number, staffed with both English and Hebrew speaking representatives, will also be made available. Moreover, the Tel-Aviv based law office of Jacob Sabo, Lead Plaintiff's counsel, will maintain a phone number for inquiries and will be prepared to mail or otherwise provide Amended Notice and Proof of Claim forms on an as-requested basis to Israeli Class Members.

Since the proposed detailed Amended Notice, containing all the relevant information about the settlement and Class Member rights, will be mailed to Class Members and supported by Summary Notice published in several newspapers, the method and form of the Amended Notice is sufficient and is hereby approved. The Proof of Claim form itself, to be filled out by participating Class Members, is also sufficient.[34]

Fairness Hearing and Scheduling

A Fairness Hearing will be conducted in accordance with the accompanying Order. That order also sets forth the dates for required submissions from parties and Class Members. If a timely application for attorney's fees and expenses is made by the date set forth in the Order, the Court will take up that issue at the Fairness Hearing as well.

---

[34] At oral argument on this motion, the Court noted that Part I of the Proof of Claim form needed to be corrected to state "For Claims Administrator's Use Only." The parties have made such a change although the change does not indicate which part is to be completed by the Claims Administrator as clearly as it might.

**CONCLUSION**

For the reasons set forth above, the motions are granted. The schedule for future submissions and the Fairness Hearing is included in the accompanying Order. The Clerk is directed to transmit a copy of the within to all parties.


SO ORDERED.

Dated :  Brooklyn, New York
         April 19, 2007


                    By: /s/ Charles P. Sifton (electronically signed)
                            United States District Judge