UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
In re: Gilat Satellite Networks, Ltd.,

                                             CV-02-1510
                                             (CPS)(SMG)

                                             MEMORANDUM
                                             OPINION AND
                                             ORDER

----------------------------------------X

SIFTON, Senior Judge.

On January 17, 2003, eleven class actions alleging violations of federal securities laws by Defendants Gilat Satellite Networks, Ltd. ("Gilat"), Yoel Gat, and Yoav Leibovitch (collectively "Defendants") were consolidated in this Court and Leumi PIA Sector Fund, Leumi PIA World Fund, and Leumi PIA Export Fund were appointed Lead Plaintiffs.[1] On May 13, 2003, Lead Plaintiffs filed a Consolidated Class Action Complaint (the "Original Consolidated Complaint"), alleging against all Defendants violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated under the Exchange Act, 17 C.F.R. § 240j.10b-5. The complaint also alleges against Gat and Leibovitch a violation of Section 20(a) of the Exchange Act. On April 19, the undersigned certified the

---

[1] In 2005, while this case was pending, Leumi PIA, which owns and manages the three mutual funds referred to herein, was sold to Harel Insurance Investments Ltd. and is now known as "Harel-PIA Group." The names of the individual funds have also changed. To avoid confusion, the parties continue to refer to Lead Plaintiffs by their prior names, except where noted.

On February 12, 2003, Glancy Binkow & Goldberg LLP, Bernstein Liebhard & Lifshitz, LLP, and Cohen, Milstein, Hausfeld & Toll, P.L.L.C. were appointed co-lead counsel for Lead Plaintiffs.

settlement class and granted the parties' motions for preliminary approval of a proposed Settlement Agreement, preliminary approval of a Plan of Allocation, and approval of the proposed manner and form of Notice to the settlement class and of the proposed Proof of Claim form. A Fairness Hearing was held on July 19, 2007 to consider final approval of the settlement. Now before the Court are the parties' joint motion for final approval of the proposed Settlement Agreement, Plaintiffs' Co-Lead Counsel's motion for attorney's fees and expenses, and Imanuel Liban's[2] motion for attorney's fees and expenses, as well as Mr. Liban's August 20, 2007 supplemental filing entitled "Clarification On Behalf of Mr. Imanuel Liban." For the reasons set forth below, the parties' motion for final approval of the Settlement Agreement is granted, Lead Counsel's motion for attorney's fees and expenses is granted in part and denied in part, and Imanuel Liban' motion for attorney's fees and expenses is denied.

## BACKGROUND

Familiarity with the underlying facts and procedural history of this case, as set forth in prior decisions of this Court, is presumed. Only those facts relevant to the present motion are discussed herein.

---

[2] Although Mr. Liban describes himself as an objector, he does not in fact object to any part of the settlement or Lead Counsel's fee award.

## Gilat's Business

Gilat is a provider of products and services for satellite-based communications products and services, including Very Small Aperture Terminal ("VSAT") satellite dishes. During the relevant time periods, February 10, 2000 through May 31, 2002, Yoel Gat was Gilat's Chief Executive Officer and Yoav Leibovitch was Gilat's Chief Financial Officer.

In January 2000, Gilat formed a joint venture, StarBand, with Microsoft and EchoStar Communications, to provide internet access via satellite dishes. Customers would purchase a VSAT manufactured by Gilat and then pay a monthly fee to receive internet access. The StarBand service was made available to the public in November 2000.

During the relevant time periods, Gilat common stock was traded on the NASDAQ National Market System ("NASDAQ"). From 1997 to 2000, Gilat reported substantial growth in revenues and its stock rose significantly. On February 28, 2000, Gilat stock closed on the NASDAQ at $160.50 a share.

## Claims Against Defendants

According to the Amended Consolidated Complaint, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and defendants Gat and Leibovitch violated

Section 20(a) of the Exchange Act.[3]  More specifically, Lead
Plaintiffs allege that Defendants artificially inflated Gilat's
financial results through deceptive financial statements which
overstated Gilat's revenues.  Although Defendants purported to
follow Generally Accepted Accounting Principles ("GAAP"),[4] they
allegedly inflated reported revenues in press statements and
Securities and Exchange Commission ("SEC") filings through
premature revenue recognition, recording revenue from sales in
excess of actual purchases, recognizing revenue from sales prior
to delivering the product to customers, recognizing revenue from
sales to uncreditworthy customers, recording goods placed on
consignment as sold, and engaged in related-party transactions.
Lead Plaintiffs further allege that the defendants misrepresented
the performance of StarBand and the market for its services,
claiming significant success while there were allegedly serious
problems with the service and in signing up new subscribers.  The
Amended Consolidated Complaint also alleges that Defendants
failed to disclose that Echostar Communications had not marketed
Starband as promised and that Starband's lenders had withdrawn a

---

[3] For the purposes of this motion, I only discuss those claims in the
Complaint which survived Defendants' October 29, 2004 motion to dismiss, which
I granted in part and denied in part.

[4] According to the complaint, "GAAP are those principles recognized by
the SEC and the accounting profession as the conventions, rules, and
procedures necessary to define proper accounting practice at a particular
time." Amended Consolidated Complaint, ¶ 192. 17 C.F.R. § 210.4-01 states that
financial statements filed with the SEC that are not in accordance with GAAP
are presumed to be misleading or inaccurate.

$37 million line of credit and that the Defendants falsely stated that Gilat's total financial exposure to Starband would not exceed $75 million.  According to Lead Plaintiffs, as a result of these materially false and misleading statements, made between February 10, 2000 and May 31, 2002 (the "Class Period"),[5] they and other class members suffered damages because they purchased or otherwise acquired Gilat securities at prices which were artificially inflated.  The maximum estimated damages alleged by Lead Plaintiffs amount to $187 million.

Settlement Negotiations and Preliminary Approval

In June 2006, the parties engaged in two days of mediation before retired California Superior Court Judge Daniel Weinstein.[6] As a result of that mediation, the parties reached an agreement on the terms of the settlement.

On December 1, 2006, the parties moved for (1) certification of a settlement class; (2) preliminary approval of a proposed Settlement Agreement; (3) approval of proposed Plan of Allocation; (4) approval of the proposed manner and form of Notice to the settlement class and of the proposed Proof of Claim form; and (5) scheduling of a date for a Fairness Hearing to

---

[5] As discussed below, the initial alleged fraud is said to have occurred on February 9, 2000 after the close of the markets.  Accordingly, the Class Period begins on February 10.

[6] An earlier attempt at mediation had failed.

consider final approval of the settlement.  On January 4, 2007, this Court certified the settlement class, but denied the motions for preliminarily approval of the Settlement Agreement and the Plan of Allocation without prejudice,[7] and, accordingly, denied the motions for approval of the proposed Notice and for scheduling of a date for a Fairness Hearing.[8]

The parties then revised the settlement in light of this Court's ruling and moved again for the same relief and on April 19, 2007, I (1) certified an amended settlement class; (2) granted preliminary approval of the Settlement Agreement; (3) granted preliminary approval of the proposed Plan of Allocation; (4) approved the proposed manner and form of Notice and the proposed Proof of Claim form; and (5) scheduled a Fairness Hearing for July 19, 2007. *See In re Gilat Satellite Networks, Ltd.,* 2007 WL 1191048 (E.D.N.Y. 2007).  I also issued an Order specifying, among other things, the dates by which the parties had to provide notice and the dates by which Class Members had to file objections or requests for exclusion from the Class.[9]  In addition, I set September 3, 2007 as the date by which Proof of

---

[7] Specifically, I held that the Settlement Agreement and Plan of Allocation failed to sufficiently set forth factual bases for presumptions about the timing of alleged disclosures, contained internal inconsistencies regarding dates and recovery amounts, and provided no explanation for the parties' decision to include a $5 minimum claim amount.

[8] In denying those motions, the Court also alerted the parties to minor typographical errors and aspects of the Notice which required clarification.

[9] Objections and requests for exclusion were to be received no later than 20 days before the Fairness Hearing.

Claim forms had to be returned by Class Members. *See In re Gilat Satellite Networks, Ltd.,* 2007 WL 1191137 (E.D.N.Y. 2007).

Mailing of Notice

The parties submitted an affidavit on July 5, 2007, confirming that Notice was mailed on May 9 to 374 shareholders of record and 2,748 brokerage firms, banks, institutions and others who may serve as nominee owners, as required; that a copy of the Notice was placed on the website of the Claims Administrator, Garden City Group ("GCG"), on May 9, as required; that copies of the Notice were placed on the websites of Plaintiff's Co-Lead Counsel on May 17 and May 18, 1 and 2 days later than was required, though the delay was due to inadvertent error;[10] that toll-free phone numbers for inquires with English and Hebrew speaking operators were placed into service by GCG by May 14, as required;[11] that local counsel in Israel placed into service a local phone number for inquires, as required;[12] and that Summary Notice was published in *Wall Street Journal* on May 23, *Ha'aretz*

---

[10] Though this Court's Order required Notice to be placed on the websites within 7 days of mailing of the Notice, this inadvertent error is harmless.

[11] As of July 5, 108 calls were received by the Claims Administrator and all requests for a return call have been responded to.

[12] The affidavit does not state when the local number was put into service. However, at the Fairness Hearing, Israeli counsel for the Lead Plaintiff's, Jacob Sabo, confirmed that the number was his office number. No calls were made to that number as of July 5.

and the *Jerusalem Post* on May 22, and *Globes* on May 21, as
required.  Since the original date of the mailings, nominee
owners have requested that GCG mail Notice directly to 17,417
potential Class Members and that GCG mail an additional 4,178
copies of the Notice to nominee owners for forwarding to
potential Class Members.  GCG has responded to these requests as
they were made in a timely manner.  In addition, the Postal
Service has provided updated address information for each of the
374 shareholders of record and Notice has been re-mailed to them.
As a result, on July 23, 2007, I ordered that the deadline for
requests for exclusion and objections by Class Members who had
not received actual Notice prior to July 15, 2007 be extended
until September 3, 2007.

No requests for exclusion or objections to the Settlement
Agreement have been received by GCG, the parties or this Court as
of the date of this Opinion.[13]

Settlement Agreement

*I. Members of the Class & Identity of Lead Plaintiffs*

According to the Amended Settlement Agreement, the Class
consists of "all persons and entities who purchased or otherwise
acquired Gilat common stock between February 10, 2000 and May 31,

---

[13] As discussed below, the Liban motion, though titled an "Objection . .
. to Proposed Settlement/Fees," is, in fact, a request for fees and not an
objection to the Settlement Agreement or the awarding of attorneys fees.

2002, inclusive."[14] Amended Stipulation and Agreement of Settlement, ¶ 1(c)) ("Amended Settlement").

> Excluded from the Class are Defendants, members of the immediate family of each of Defendants, any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party. "Related to or affiliated with" means all companies, subsidiaries, joint ventures, joint subsidiaries, or other entities controlled by any Defendant, or any entity that is or was under common corporate ownership or control with any Defendant.

*Id.*

Lead Plaintiffs in this case are three mutual funds, managed by Harel-PIA Group, Israel's longest established mutual fund management company, representing more the $3 billion in assets. Harel-PIA Group is owned by Harel Insurance Investments Ltd., a publically traded Israeli insurance company. The three funds who serve as Lead Plaintiffs manage between $7 million and $17.5 million in assets each.

None of these three funds owned Gilat stock at the beginning of the Class Period and they each purchased and sold

---

[14] In the Plan of Allocation, the parties note that:

Common stock (and other securities) may be acquired by means other than purchase on the open market. Examples of other methods of acquisition include acquiring stock through by exercising warrants or stock options, or acquiring stock through an employer stock distribution.

Amended Notice of Proposed Settlement, n.1 ("Amended Notice").

shares during several of the time periods described in the Plan
of Allocation below.[15]  Exhibit A annexed to the Declaration of
Michael Civer (filed with the December 2006 motion) reflects that
Leumi PIA World Fund purchased 87,950 shares of Gilat stock
during periods 1, 3 and 4 and sold stock during periods 1, 3 and
4; the fund sold all its stock before the end of the Class
Period. Civer Declaration, ¶ 6, Exhibit A.  Leumi PIA Export Fund
purchased 11,000 shares of Gilat stock during period 1, sold
4,000 shares during period 1 and held the remainder until after
the end of period 5. *Id.*  Leumi PIA Sector Fund purchased 6,000
shares during period 1 and sold all of its shares during period
3. *Id.*  Lead Plaintiffs will not receive any compensation or
recovery under the settlement for acting as Lead Plaintiffs.[16]

II. *Released Parties*

     Under the terms of the Settlement Agreement, the "Released
Parties" are:

> any and all of Defendants and their respective present
> and former affiliates, predecessors, successors, and
> assigns, and each of their respective family members,
> heirs, executors, and administrators, and any corporate
> entity affiliated with any of the Defendants,

---

[15] The time periods, detailed below, are (1) February 10, 2000 through
March 9, 2001 at 2:40 P.M.; (2) March 9, 2001 after 2:40 P.M. through March
11, 2001; (3) March 12, 2001 through October 2, 2001; (4) October 3, 2001
through May 31, 2002; and (5) the 90-day period after the end of the Class
Period, beginning May 31, 2002 and ending August 28, 2002.

[16] Lead Plaintiffs' motion for reimbursement of expenses is discussed
below.

including, but not limited to, Gilat, and its presents
and former officers, directors, employees, partners,
principals, trustees, attorneys, auditors, accountants,
investment bankers, consultants, agents, insurers and
co-insurers and each of their respective heirs,
executors, administrators, predecessors, successors
(including, but not limited to, successors in
bankruptcy) and assigns.

Amended Settlement, ¶ 1(q).


## III. *Claims Administrator*

Lead Plaintiffs' counsel have proposed GCG as their Claims
Administrator.[17]  GCG has been in the business of administering
class action settlements for twenty years and has administered
hundreds of class action settlements, including several
well-known securities settlements. First Affidavit of Shandarese
Garr, ¶ 2-3 ("Garr First Affidavit") (attached to December 2006
motion).[18]  The firm has experience handling international
aspects of class action settlements, and it has in the past
provided such services as toll-free numbers and websites which
accommodate non-English speakers. *Id.*, ¶ 6.  The firm strives to
complete all work and provide final reports within six months of
the claims-filing deadline and foresees no reason why it could
not adhere to that timeline in this case. *Id.*, ¶ 8.

---

[17] Pursuant to this Court's April 19 Order, GCG was engaged to send out
the Notice and provide related services.

[18] The securities class action settlements administered by GCG include
*Worldcom Securities Litigation* and *Nortel Networks Corp. Securities
Litigation.*

Lead Plaintiffs' counsel selected GCG after reviewing the available options.  All three firms have had favorable experiences with GCG in prior securities settlements and have found that "GCG provides professional and high quality work, at competitive rates." Declaration of Daniel Sommers, ¶ 8 ("Sommers Declaration") (attached to December 2006 motion).[19]

IV. *Settlement Fund*

Under the Settlement Agreement, Defendants have agreed to pay $20 million to the Class ("Gross Settlement Fund"),[20] in exchange for release of all claims "arising out of, based upon or related to the purchase of Gilat common stock during the Class Period and that facts, transactions, events, occurrences, acts, disclosures, statements, omissions or failures to act that were alleged in Action." Amended Settlement, ¶ 1(r)), 5(a), 5(b). After accounting for (1) taxes on the income from the Settlement Fund, (ii) the notice and administrative costs of settlement, (iii) attorneys' fees and expenses awarded by this Court, and (iv) additional administrative expenses, the "Net Settlement Fund" will be distributed according to the Plan of Allocation

---

[19] The parties note that while GCG's rates are "not necessarily the lowest among claims administrators," they are reasonable and justified by the quality of the work. GCG has also submitted a document listing "Standard Hourly Billing Rates," though no estimated total cost for their services in this matter has been provided. Garr First Affidavit, Exhibit A.

[20] As of the date of the Fairness Hearing, the Gross Settlement Fund had accrued $320,688 in interest.

among Class members who do not opt-out of the settlement and who submit valid proofs of claim. *Id.*, ¶ 7, 13-16.

Under the Settlement Agreement, Lead Plaintiffs' counsel may expend, without further approval from the Court, up to $300,000 from the Gross Settlement Fund to pay the reasonable costs and expenses associated with identifying Class members, publishing, printing and mailing notice and the administrative fees charged by the Claims Administrator in connection with providing notice and processing submitted claims. *Id.*, ¶ 8. The Amended Settlement also provides that Lead Counsel will apply to the Court for an award of attorneys fees of up to 30% of the Gross Settlement Amount and reimbursement of expenses, also payable from the Gross Settlement Amount; these fees and expenses are to be allocated among counsel in proportion to their respective contributions to the prosecution and resolution of this suit. *Id.*, ¶ 9.

*V. Amended Plan of Allocation*

The Amended Plan of Allocation proposed by the Lead Plaintiffs is set out in the Amended Notice of Proposed Settlement and was prepared with the assistance of a damages consultant, Michael Marek, CFA. *See* Declaration of Michael Marek. The Plan of Allocation "reflects the Lead Plaintiffs' allegations that the price of Gilat's common stock was inflated artificially

during the Class Period." Amended Notice, ¶ 38. According to

Lead Plaintiffs, the artificial inflation began on or before

February 10, 2000 and Gilat's stock remained inflated throughout

the Class Period, until May 31, 2002. *Id*. However, at certain

times during the Class Period, Gilat made disclosures which

partially revealed the alleged fraud and caused the stock price

to fall, thereby reducing the amount of artificial inflation

caused by earlier allegedly false and misleading statements.

Accordingly, the Plan of Allocation identifies five different

time periods and allocates damages on the basis of the amount of

artificial inflation remaining in the stock price during each of

these periods. "Each Authorized Claimant shall be allocated a

pro rata share of the Net Settlement Fund based on his, her or

its Recognized Claim as compared to the total Recognized Claims

of all Authorized Claimants." *Id.*, ¶ 41.


1) Time Period 1: February 10, 2000 - March 9, 2001 at 2:40 PM

        According to the Amended Consolidated Complaint, after the

close of the markets on February 9, 2000, Bloomberg reported on

comments made by Gat at a conference regarding StarBand's

business prospects which were "materially false and misleading."

Amended Consolidated Complaint, ¶¶ 66-67; see also Marek

Declaration, ¶ 5. Accordingly, the relevant Class Period begins

on February 10, the first trading day after the allegedly false

statements.

"The first alleged partial disclosure of fraud occurred on March 9, 2001, when Defendants revealed that a previously announced initial public offering of StarBand stock would not proceed." Amended Notice, ¶ 38. According to the parties' damages consultant, the disclosure was made at 2:40 P.M. EST. Marek Declaration, ¶ 7. For stock purchased before 2:40 P.M. on March 9, 2001 the damages consultant concluded that the price of Gilat stock was inflated by $16.62 per share. Therefore

> for common stock purchased prior to 2:40 p.m. EST on March 9, 2001 and held through the end of the Class Period, the Plan of Allocation provides for a maximum Recognized Loss of $16.62.[21] For stock sold earlier than the end of the Class Period, and thus before the full amount of alleged inflation had gone out of the stock, the Recognized Loss will be lower than the maximum.

Amended Notice, ¶ 38. Since some Class Members will be unable to prove the time at which they purchased their Gilat stock on that day, the stock price of $32.875 will be used as a proxy under the Plan, since $32.875 was the price per share of the last trade prior to the 2:40 PM disclosure. Trades at or above $32.875 will be deemed to have occurred prior to 2:40 PM and trades below that amount will be deemed to have occurred after 2:40 PM. *Id.*, n.6.[22]

---

[21] The Recognized Loss is "a calculation of a particular Authorized Claimant's losses that are recognized as compensable in some measure under the Settlement." Notice, ¶ 37.

[22] According to the damages consultant, 99% of trades above $32.875 were made prior to 2:40 PM. Marek Declaration, ¶ 10.

2)  Time Period 2: March 9, 2001 after 2:40 P.M. - March 11, 2001[23]

Gilat's stock price fell on March 9 after the disclosure at 2:40 P.M. and, according to the damages consultant, $1.19 of the decline was attributable to the StarBand announcement of March 9, leaving $15.43 of artificial inflation in the stock. Amended Notice, ¶ 38.

> Accordingly, for purchases after 2:40 p.m. EST on March 9, 2001 but prior to March 12, 2001, and held through the end of the Class Period, the Plan of Allocation provides for a maximum Recognized Loss of $15.43.  For stock sold earlier than the end of the Class Period, and thus before the full amount of alleged inflation had gone out of the stock, the Recognized Loss will be lower than the maximum.

*Id*.

3)  Time Period 3: March 12, 2001 - October 2, 2001

According to Lead Plaintiffs, the alleged fraud was further partially revealed on March 12, 2001, prior to the opening of the market,[24] "when Defendants announced downwardly-revised earnings guidelines for Gilat," leading to a further decline in Gilat's stock price, $13.10 of which was attributable to that disclosure; as a result, Gilat's stock price after the disclosure was inflated by $2.33. *Id*.

---

[23] There was no trading on March 10 or March 11.

[24] The press release disclosing this information was at 8:57 A.M. EST. Marek Declaration, ¶ 12.

>Accordingly, for purchases on or after March 12, 2001 but before October 3, 2001 and held through the end of the Class Period, the Plan of Allocation provides for a maximum Recognized Loss of $2.33. For stock sold earlier than the end of the Class Period, and thus before the full amount of alleged inflation had gone out of the stock, the Recognized Loss will be lower than the maximum.

*Id.*

4) Time Period 4: October 3, 2001 – May 31, 2002

According to Lead Plaintiffs, Defendants made additional disclosures on October 2, 2001, after the close of the markets,[25] announcing that Gilat would take "tens of millions of dollars in charges and make an additional bad debt reserve of $10 million." *Id.* After this disclosure, the remaining $2.33 in inflation was removed from the stock. However, the disclosure allegedly contained an additional misstatement which caused a new inflation of $0.30. *Id.*

>Accordingly, for common stock purchased on or after October 3, 2001 but on or before May 31, 2002, and held through the end of the Class Period, the Plan of Allocation provides for a maximum Recognized Loss of $0.30. For stock sold earlier than the end of the Class Period, and thus before the full amount of alleged inflation had gone out of the stock, the Recognized Loss will be lower than the maximum.

*Id.*

---

[25] The press release disclosing this information was at 5:53 P.M. EST. Marek Declaration, ¶ 15.

5) Time Period 5: May 31, 2002 - August 28, 2002

According to Lead Plaintiffs, the final disclosure occurred on May 31, 2002, when Defendants filed a Form 20F with the S.E.C. which announced "increased reserves for uncollectible accounts receivable." *Id.*[26] Accordingly, "no purchases after this date are recognized under the Plan of Allocation." *Id.* In addition, the Plan of Allocation reflects a limitation on damages in securities cases imposed under the Private Securities Litigation Reform Act ("PSLRA"), limiting recovery for Class Members who sold after the close of the Class Period, namely May 31, 2002.[27] See 15 U.S.C. § 78u-4. Under the Plan, recovery on stock sold between May 31, 2002 and August 28, 2002 may be no greater than the purchase price of the stock minus the average trading price of the stock between May 31, 2002 and the date of sale. Recovery for stock sold after August 28, 2002 may be not exceed the purchase price of the stock minus the 90-day mean trading price of $0.95. *Id.*, n.8.

---

[26] The time of the filing is not available, but since such filings are normally submitted after the close of business and the price decline on Gilat stock did not occur until the next trading day, the damages consultant concluded that the disclosure occurred after the close of trading on May 31. Id., ¶ 19.

[27] Under the PSLRA, plaintiff's damages are limited in securities class actions by the mean stock trading price for the 90-day period (the 'lookback' period) subsequent to the corrective disclosure - recovery cannot be greater than the purchase price minus the mean trading price during the lookback period. Similarly, if a party sold the stock during that same 90-day period, the damages may not exceed the difference between the purchase price and the mean trading price of the security from the date of disclosure until the date of sale.

The Plan of Allocation also provides that transactions resulting in recognized gains will be excluded from the calculation of the net Recognized Claim; the costs/proceeds associated with securities purchased or sold by reason of having exercised an option or warrant shall be incorporated into the price accordingly; shares originally sold short shall have a Recognized Claim of $0; and no payments will be made on a claim where the potential distribution is less than $5.00.[28] Amended Notice, ¶ 40.

In summary, the Plan of Allocation establishes the following claim calculations.  For authorized claimants who purchased stock between February 10, 2000 and March 9, 2001 at 2:40 P.M., inclusive, claims will be calculated as follows:

(1) for stock retained until the end of trading on August 28, 2002, the Recognized Loss shall be the lesser of (a) $16.62 per share or (b) the difference between the purchase price per share and $0.95;

(2) for stock sold between February 10, 2000 and 2:40 P.M. on March 9, 2001, inclusive, there shall be no Recognized Loss;

(3) for stock sold after March 9, 2001 at 2:40 P.M. but prior to March 12, 2001, the Recognized Loss shall be the lesser

---

[28] As set out in the Opinion on preliminary approval, this Court's understanding of this clause is that claims which, under the optimal distribution scenario, are worth less than $5 will not be paid out. However, claims which are potentially worth more than $5 but, after the allocations have been determined are worth less in practice, will be paid out.

of (a) $1.19 per share or (b) the difference between the purchase price per share and the sales price per share;

(4) for stock sold between March 12, 2001 and October 2, 2001, inclusive, the Recognized Loss shall be the lesser of (a) $14.29 per share or (b) the difference between the purchase price per share and the sales price per share;

(5) for stock sold between October 3, 2001 and May 31, 2002, inclusive, the Recognized Loss shall be the lesser of (a) $16.32 per share or (b) the difference between the purchase price per share and the sales price per share;

(6) for stock sold between June 1, 2002 and August 28, 2002, inclusive, the Recognized Loss shall be the lesser or (a) $16.62 per share, (b) the difference between the purchase price per share and the sales price per share or (c) the difference between the purchase price per share and the mean closing price of Gilat common stock between May 31, 2002 and the date of sale. Amended Notice, ¶ 39(a).

For authorized claimants who purchased stock on after 2:40 P.M. on March 9, 2001 but before March 12, 2001, claims will be calculated as follows:

(1) for stock retained until the end of trading on August 28, 2002, the Recognized Loss shall be the lesser of (a) $15.43 per share or (b) the difference between the purchase price per share and $0.95;

(2) for stock sold on March 9, 2001, there shall be no Recognized Loss;

(3) for stock sold between March 12, 2001 and October 2, 2001, inclusive, the Recognized Loss shall be the lesser of (a) $13.10 per share or (b) the difference between the purchase price per share and the sales price per share;

(4) for stock sold between October 3, 2001 and May 31, 2002, inclusive, the Recognized Loss shall be the lesser of (a) $15.13 per share or (b) the difference between the purchase price per share and the sales price per share;

(5) for stock sold between June 1, 2002 and August 28, 2002, inclusive, the Recognized Loss shall be the lesser or (a) $15.43 per share, (b) the difference between the purchase price per share and the sales price per share or (c) the difference between the purchase price per share and the mean closing price of Gilat common stock between May 31, 2002 and the date of sale. Amended Notice, ¶ 39(b).

For authorized claimants who purchased stock between March 12, 2001 and October 2, 2001, inclusive, claims will be calculated as follows:

(1) for stock retained until the end of trading on August 28, 2002, the Recognized Loss shall be the lesser of (a) $2.33 per share or (b) the difference between the purchase price per share and $0.95;

(2) for stock sold between March 12, 2001 and October 2, 2001, inclusive, there shall be no Recognized Loss;

(3) for stock sold between October 3, 2001 and May 31, 2002, inclusive, the Recognized Loss shall be the lesser of (a) $2.03 per share or (b) the difference between the purchase price per share and the sales price per share;

(4) for stock sold between June 1, 2002 and August 28, 2002, inclusive, the Recognized Loss shall be the lesser or (a) $2.33 per share, (b) the difference between the purchase price per share and the sales price per share or (c) the difference between the purchase price per share and the mean closing price of Gilat common stock between May 31, 2002 and the date of sale. Amended Notice, ¶ 39(c)).

For authorized claimants who purchased stock between October 3, 2001 and May 31, 2002, inclusive, claims will be calculated as follows:

(1) for stock retained until the end of trading on August 28, 2002, the Recognized Loss shall be the lesser of (a) $0.30 per share or (b) the difference between the purchase price per share and $0.95;

(2) for stock sold between October 3, 2001 and May 31, 2002, inclusive, there shall be no Recognized Loss;

(3) for stock sold between June 1, 2002 and August 28, 2002, inclusive, the Recognized Loss shall be the lesser or (a)

$0.30 per share, (b) the difference between the purchase price per share and the sales price per share or (c) the difference between the purchase price per share and the mean closing price of Gilat common stock between May 31, 2002 and the date of sale. Amended Notice, ¶ 39(d).

## DISCUSSION

I. Final Approval of Settlement and Plan of Allocation

Under Rule 23(e) of the Federal Rules of Civil Procedure, class actions "shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." Fed. R. Civ. P. 23(e).

"The central question raised by [a] proposed settlement of a class action is whether the compromise is fair, reasonable, and adequate." *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982). To determine whether this standard has been met, the court must "compare the terms of the compromise with the likely rewards of litigation." *In re Warner Communications Securities Litigation*, 618 F. Supp. 735, 741 (S.D.N.Y. 1985)(citations omitted). In evaluating the substantive fairness of a proposed settlement, the Court is guided by the nine factors initially enumerated in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974):

> (1) the complexity, expense and likely duration of the
> litigation, (2) the reaction of the class to the
> settlement, (3) the stage of the proceedings and the
> amount of discovery completed, (4) the risks of
> establishing liability, (5) the risks of establishing
> damages, (6) the risks of maintaining the class action
> through the trial, (7) the ability of the defendants to
> withstand a greater judgment, (8) the range of
> reasonableness of the settlement fund in light of the
> best possible recovery, (9) the range of reasonableness
> of the settlement fund to a possible recovery in light
> of all the attendant risks of litigation[.]

*D'Amato v. Deutsche Bank*, 236 F.3d 78, 86 (2d Cir. 2001)

(citations omitted).  The court must also examine the negotiating

process that gave rise to the settlement to determine if it was

achieved through arms-length negotiations by counsel with the

experience and ability to effectively represent the class's

interests. *See In re Warner Communications Securities Litigation*,

618 F. Supp. at 741; *see also D'Amato*, 236 F.3d at 85 ("The

District Court determines a settlement's fairness by examining

the negotiating process leading up to the settlement as well as

the settlement's substantive terms.").


*1) Complexity, Expense and Likely Duration of the Litigation*

Securities class action litigation "'is notably difficult

and notoriously uncertain.'" *In re Sumitomo Copper Litigation*,

189 F.R.D. 274, 281 (S.D.N.Y. 1999) (quoting *In re Michael Milken*

*and Associates Securities Litigation*, 150 F.R.D. 46, 53 (S.D.N.Y.

1993)).  In this case, the costs of litigating are anticipated to

be significant, since extensive discovery remains to be completed

and since both Gilat and the companies with which Gilat did business under the allegedly fraudulent scheme are located overseas,[29] which will increase the cost and complexity of discovery. *See Schwartz v. Novo Industri A/S,* 119 F.R.D. 359, 363 (S.D.N.Y. 1988) (weighing the complications of discovery with a foreign defendant in favor of settlement). In addition, the parties state that if the case were litigated and Plaintiffs prevailed, Defendants would appeal the verdict, adding further delay and expense. *See In re Am. Bank Note Holographics, Inc.,* 127 F.Supp.2d 418, 425 (S.D.N.Y. 2001) ("Add on time for a trial and appeals, and the class would have seen no recovery for years. Class counsel properly considered this factor as well").

*2) Reaction of the Class*

No objections or requests for exclusion have been filed in this case, indicating general approval of the Settlement by Class Members. *See In re Mexico Money Transfer Litigation (Western Union and Orlandi Valuta)*, 164 F.Supp.2d 1002, 1021 (N.D.Ill. 2000) (99.9% of class members having neither opted out nor filed objections indicated strong circumstantial evidence in favor of settlement.).

---

[29] Sales related to the alleged fraud were made to companies around the world, including Zimbabwe, Brazil, China, Indonesia, and Kazakhstan.

*3) Stage of the Proceedings*

The stage of the proceedings and the amount of discovery the parties have conducted is "relevant to the parties' knowledge of the strengths and weaknesses of the various claims in the case, and consequently affects the determination of the settlement's fairness." *In re Painewebber Ltd. Partnerships Litigation*, 171 F.R.D. 104, 126 (S.D.N.Y., 1997). The parties have spent significant time over the last four years investigating the legal and factual issues in this case and appear to be well informed as to the operative facts. Although little formal discovery has been completed, Lead Counsel has interviewed several former employees of Gilat and obtained a number of internal documents,[30] and all parties have conducted extensive research in connection with their submissions in connection with Defendants' motion to dismiss and in preparation for mediation.

*4 & 5) Risks of Establishing Liability & Damages*

"In assessing the adequacy of a settlement, a court must balance the benefits of a certain and immediate [relief] against the inherent risks of litigation." *In re Medical X-Ray Antitrust Litigation*, 1998 WL 661515, at *4 (E.D.N.Y. 1998). In this case, the risks of establishing liability and damages are considerable.

---

[30] Discovery is discussed in more detail below, in regard to attorneys fees.

"To prevail on its federal securities fraud claims, [Plaintiffs] must demonstrate that its injuries were caused by defendants' omission of material information," *Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 196 (2d Cir. 2003), and must also prove that Defendants acted with scienter. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185 (1976). Establishing scienter is "a difficult burden to meet," *Adair v. Bristol Technology Systems, Inc.,* 1999 WL 1037878, at *2 (S.D.N.Y. 1999), and proving it will be especially challenging in this case where, apparently, neither the individual defendants nor any other Gilat executive profited from their Gilat investments. In addition, at trial Defendants would likely introduce experts to contest Lead Plaintiffs' allegations as to the causes of the stock price declines, leading to a "battle of the experts," the outcome of which is uncertain. Specifically, while Lead Plaintiffs allege that the most significant stock decline, which occurred on March 12, 2001, was related to Gilat's financial announcement of that day, Defendants dispute this and argue instead that the stock decline was related to prior announcements and, moreover, that the announcement of March 12 did not reveal any fraud. Accordingly, it is uncertain whether Lead Plaintiffs will be able to demonstrate loss causation related to the March 12 announcement, which would reduce alleged damages from $187 million to $27 million.

*6) Risks of Maintaining the Class Action through the Trial*

The parties contend that Defendants, should settlement not be approved, may challenge the certification of the Class before trial (and appeal any adverse ruling) on the grounds that there was no predominance of common issues among the Class Members, as required under Fed. R. Civ. P. 23. However, having previously approved the Class and found that the claims of Class Members all resulted from the alleged fraud which caused the inflated stock price, I find there to be little risk that the Class would not be maintained through trial.

*7) Ability of Defendants to Withstand Greater Judgement*

It remains an open question whether Defendants could withstand a greater judgment. The parties have represented that Gilat was forced to restructure $350 million of debt in 2002, that its stock price is in the single digits, and that Gilat's insurance would not cover an award of Lead Plaintiff's total estimated damages.[31] However, the parties have not provided this Court with any specific information as to the value of Gilat's assets or the impact that higher judgement amounts would have on Gilat's ability to continue as a functioning entity. Accordingly, this factor weighs neither in favor nor against settlement.

---

[31] Gilat has filed insurance coverage information under seal.

*8 & 9) Range of Reasonableness of the Settlement Fund in Light of*
*the Best Possible Recovery & Range of Reasonableness of the*
*Settlement Fund to a Possible Recovery in Light of all the*
*Attendant Risks of Litigation*

As this court has observed, "the adequacy of the amount
offered must be judged not in comparison with the best possible
recovery in the best of all possible worlds, but rather in light
of the strengths and weaknesses of the plaintiffs' case." *In re*
*Medical X-Ray Antitrust Litigation*, 1998 WL 661515 at *5
(internal quotations and citations omitted).  As stated above,
Defendants have agreed to contribute $20 million to the Gross
Settlement Fund.[32]  $20 million represents 10.6% of the maximum
amount which Plaintiffs believe could be recovered at trial, and
is within the range of settlements that have been awarded in
securities class actions. *See Kurzweil v. Philip Morris*
*Companies, Inc.,* 1999 WL 1076105, at *2 (S.D.N.Y. 1999)
("[I]ndependent research discloses that recoveries in securities
class actions tend to fall in the 7% to 15% range."); Cornerstone
Research, *Post Reform Act Securities Settlements, 2005 Review and*
*Analysis* (submitted as Exhibit B) (Finding a median settlement
amount of $7.5 million, an average settlement amount of $28.5

---

[32]  After attorney's fees and other costs associated with this action,
the Net Settlement Fund will likely be in the range of $13 million to $14
million.

million,[33] and a median settlement amount as a percentage of
estimated damages of 3.1% in 2005); PriceWaterhouseCoopers, *2005
Securities Litigation Study* (submitted as Exhibit A) (Finding a
median settlement amount of $9.5 million and an average
settlement amount of $71.1 million in 2005[34]).  Given the risks
involved in proving liability and damages, were this case to
proceed to trial there is a significant possibility that the
Class would recover much less or even nothing, while incurring
additional costs in the process.

In addition, as I set out in my Opinion on preliminary
approval, the parties have established a reasonable formula for
allocating recovery to Class Members on the basis of each Class
Member's injury and the date and time of various disclosures by
Defendants.

## 10) *Arms Length Negotiations*

In my Opinion on preliminary approval, I concluded that the
Settlement Agreement was procedurally fair as well.  The parties
mediated the case before a retired state court judge who has
attested to the thoroughness, reasonableness and 'arms-length'
nature of the negotiations. *See In re Independent Energy Holdings
PLC,* 2003 WL 22244676, at *4 (S.D.N.Y. 2003) ("the fact that the

---

[33] These figures exclude two settlements of over a billion dollars.

[34] These figures exclude three settlements of over a billion dollars.

Settlement was reached after exhaustive arm's-length negotiations, with the assistance of a private 'mediator experienced in complex litigation, is further proof that it is fair and reasonable.").  Further, there is no unduly preferential treatment to class representatives, who will receive no additional compensation from the settlement for their role as Lead Plaintiffs.  Therefore, there appears to be no collusion and I conclude that the negotiations were conducted at 'arms-length.'

Balancing all these factors, which weigh substantially in favor of settlement, I find the Settlement and Plan of Allocation to be fair, reasonable and adequate.

II. Co-Lead Counsel's Fee and Expense Request

Plaintiff's Co-Lead Counsel move for an award of 30% (equivalent to $6 million) of the Gross Settlement Fund as payment for fees and for an additional reimbursement of $588,810.43 for expenses incurred in connection with this action. I will first discuss the fee award and then deal with the request for expenses.

*Method of Determining Amount of Recovery*

"[Where] an attorney succeeds in creating a common fund from which members of a class are compensated for a common injury inflicted on the class . . . . the attorneys whose efforts

created the fund are entitled to a reasonable fee – set by the court – to be taken from the fund." *Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43, 47 (2d Cir. 2000) (internal citations omitted).  To determine the amount of the fee award, courts use two approaches: the "lodestar" method (number of hours reasonably billed multiplied by an appropriate hourly rate) and the "simpler" method of setting "some percentage of the recovery as a fee." *Id.*  In either case, "the fees awarded in common fund cases may not exceed what is 'reasonable' under the circumstances," which is committed to the sound discretion of the trial court. *Id.*

In the present case, counsel requests a fee based on a percentage of recovery.  "The trend in this Circuit is toward the percentage method, . . . which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 121 (2d Cir. 2005) (internal citations and quotations omitted).  "Use of the percentage method also comports with the statutory language of the Private Securities Litigation Reform Act ("PSLRA"), which specifies that '[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class.'" *In re NTL Inc.*

*Securities Litigation,* 2007 WL 1294377, at *4 (S.D.N.Y. 2007) (quoting 15 U .S.C. § 78u-4(a)(6)).  Accordingly, the percentage method requested by counsel is an appropriate method to calculate the fees award.

That said, "even when the percentage of the fund method is used, 'the lodestar remains useful as a baseline even if the percentage method is eventually chosen.  Indeed [the Second Circuit] encourage[s] the practice of requiring documentation of hours as a 'cross check' on the reasonableness of the requested percentage.'" *Id.* (quoting *Goldberger*, 209 F.3d at 50).


*Reasonableness of Counsel's Request*

To evaluate the reasonableness of fee requests, courts apply the *Goldberger* factors: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation ...; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Goldberger*, 209 F.3d at 50 (internal citations and quotations omitted).


*(1) Time and Labor*

Over the last four years, Plaintiffs' Counsel has spent

9,958 hours prosecuting this action.[35] Counsel expended

significant effort analyzing Gilat's SEC filings and financial

statements; reviewing analyst and news service reports on Gilat;

researching the applicable law regarding claims and potential

defenses; interviewing former employees with knowledge related to

the action; drafting a Consolidated Complaint and an Amended

Consolidated Complaint; and engaging in motion practice,

including a motion to dismiss.  The parties also began formal

discovery, developing a plan of discovery and exchanging Rule 26

materials.  Pursuant to the discovery plan, Defendants also

produced several thousand documents in an initial disclosure,

while Plaintiffs' Counsel subpoenaed documents from third-party

stock analysts.[36]  Further, Plaintiffs' Counsel consulted a

forensic accountant and also engaged an economic consultant to

evaluate defendants' loss causation theories and to calculate

class damages and develop the Plan of Allocation.[37]  Finally,

counsel engaged in two separate mediation sessions and, as a

---

[35] Glancy Binkow expended approximately 2,887 hours, Bernstein Liebhard expended approximately 3,381 hours, Cohen, Milstein expended approximately 2,430 hours and the Law Office of Jacob Sabo, who acted as Israeli counsel, expended approximately 1,259 hours.

[36] The parties also discussed the manner in which third-party discovery would be served on Gilat's customers and the scope of documentation requested, as well as the scope of Plaintiffs' subpoena of Gilat's auditors in Israel. Due to the fact that the parties were able to reach a settlement relatively early in the process of litigation, the parties ultimately did not engage in extensive formal discovery.

[37] As discussed below, the consulting fees are included in the requested expense reimbursement.

result of the second of these sessions, prepared the settlement
agreement and supporting documentation.   While formal discovery
was limited and counsel did not engage significantly in "the
major attorney time user[s] . . . . namely depositions, trial or
appeal," the extensive investigation, analysis, motion practice
and settlement negotiations which have taken place over the last
four years demonstrate that counsel has expended significant time
and effort in furtherance of this litigation. *In re Sterling
Foster & Co., Inc.,* 2006 WL 3193744, at *8 (E.D.N.Y. 2006); *cf.
In re AremisSoft Corp. Securities Litigation*, 210 F.R.D. 109, 133
(D.N.J. 2002) ("Informal discovery leading to an early settlement
that avoids such costs favors approval of the fee application.").


(2) Magnitude and Complexity of Litigation

     As noted above, securities class action litigation is
difficult and uncertain.   With regards to this factor, courts
evaluate whether the action was particularly large or complex,
relative to other securities class actions. *See In re Merrill
Lynch & Co., Inc. Research Reports Securities Litigation*, 2007 WL
313474, at *15 (S.D.N.Y. 2007)("The magnitude and complexity of a
case, however, also should be evaluated in comparison with other
securities class litigations."); *In re Bristol-Myers Squibb
Securities Litigation*, 361 F.Supp.2d 229, 234 (S.D.N.Y. 2005)
("Certainly, managing the large class of plaintiffs and reaching

a $300 million settlement was not a simple task for Lead Counsel,
but, in the realm of securities class actions, prosecution of
this action was less complex than most.  All of the alleged
misstatements were easily found in the public record.  The public
expressions of optimism uttered by the Company and its officers
provided the bases for the Erbitux claims and the financials laid
bare the channel-stuffing claims. . . . Neither the facts nor the
legal and accounting theories were complicated.  Among securities
class actions, this case as a whole was neither unique nor
complex.").

Plaintiffs' Counsel argues that this case, had it gone to
trial, would have required voluminous document and deposition
discovery.  Plaintiffs would have had to demonstrate that Gilat
recorded revenue in violation of GAAP, which would have been
complicated by the fact that the transactions occurred 6 to 8
years ago and involved companies located around the world.
Further, as noted above, Plaintiffs would have had to demonstrate
that Defendants perpetrated a fraud and that the fraud caused
Plaintiffs' losses, and would also have needed to establish the
amount of loss which resulted.  According to Plaintiffs' Counsel,
since Gilat never actually restated its financial results, proof
of accounting fraud would require circumstantial evidence which
is primarily within Defendants' control.

While litigation in this case is undoubtedly complicated and

would have taken a significant amount of time and effort to investigate,[38] Plaintiffs' claims are not particularly "novel," nor does proof of these claims appear to be so complex so as to "weigh[] significantly in favor of the award of generous attorneys' fees." *In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*, 2007 WL 313474, at *15-16 (S.D.N.Y. 2007); *see In re Elan Securities Litigation*, 385 F.Supp.2d 363, 374 (S.D.N.Y. 2005) ("[A]lthough this case was 'large and complex' involving a great many separate finance and accounting issues, the factual and legal issues were not exceptionally 'novel.'"); *cf. In re VisaCheck/Mastermoney Litigation*, 297 F.Supp.2d 503, 523 (E.D.N.Y. 2003) (finding magnitude and complexities of case "enormous" where the "case involved almost every U.S. bank and more than five million U.S. merchants"); *In re Sumitomo Copper Litigation*, 74 F.Supp.2d at 395 (case involved "almost overwhelming magnitude and complexity"); *In re NASDAQ Market-Makers Antitrust Litigation*, 187 F.R.D. 465, 474, 488 (S.D.N.Y. 1998) (finding that "liability in this case requires proof of an unusually complex conspiracy involving 37 Defendants and a 'checkerboard' of fact situations and disparate periods for each of 1,659 different securities" and

---

[38] I note that, unlike in some other cases, there was no public investigation being made by a government or regulatory body which could have assisted Plaintiffs. *See, e.g., In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*, 2007 WL 313474 at *17 ("Actions stemmed from the highly publicized NYAG's investigation into the alleged undisclosed conflict of interest.").

that "the issues were novel and difficult requiring a challenge
to a long-standing industry practice and the exercise of skill
and imagination").

(3) Risks of Litigation

"Courts of this Circuit have recognized the risk of
litigation to be 'perhaps the foremost factor to be considered in
determining' the award of appropriate attorneys' fees." *In re
Merrill Lynch & Co., Inc. Research Reports Securities Litigation*,
2007 WL 313474 at *16 (quoting *In re Elan Securities Litigation*,
385 F.Supp.2d 363, 374 (S.D.N.Y. 2005) (internal quotations and
citation omitted).  "It is well-established that litigation risk
must be measured as of when the case is filed." *Goldberger*, 209
F.3d at 55.

"There is generally only a very small risk of non-recovery
in securities class litigation." *In re Merrill Lynch & Co., Inc.
Research Reports Securities Litigation*, 2007 WL 313474 at *16
(citing *In re Dreyfus Aggressive Growth Mutual Fund Litigation*,
2001 WL 709262, at *4 (S.D.N.Y. 2001) ("What empirical data does
exist indicates that all but a small percentage of class actions
settle, thereby guaranteeing counsel payment of fees and
minimizing the risks associated with contingency fee
litigation.").  That said, Plaintiffs' Counsel, in undertaking
this case on a contingency basis, "did take some risk in

undertaking the representation." *In re Sterling Foster & Co.,
Inc.*, 2006 WL 3193744 at *7. As noted, Plaintiffs would have to
demonstrate that Defendants caused its injuries by their fraud
and that Defendants acted with scienter, and it is far from
certain that Plaintiffs would have prevailed or, to the degree
they did prevail, that a jury would agree as to the amount of
damages alleged.[39] Accordingly, while the odds of *some* recovery
were not low, counsel did assume a significant litigation risk by
taking the case on contingency. *But see In re NTL Inc. Securities
Litigation,* 2007 WL 1294377 at *7 ("The chance of some sort of
settlement was fairly high even at the beginning of the lawsuit,
before Judge Kaplan sustained several of class plaintiffs' claims
in denying defendants' motion to dismiss. Accordingly, the Court
finds that the risk of non-recovery here was low and does not
militate in favor of an 'enhanced' award of attorneys' fees.");
*In re Bristol-Myers Squibb Securities Litigation*, 361 F.Supp.2d
at 234 ("[T[he circumstances preceding the filing of the
Complaint, . . . particularly the Company's restatement of its
financials, support a finding that this case falls along the low
end of the continuum of risk.").

---

[39] Plaintiffs' Counsel also states that there was a risk that a class would not be certified. However, as indicated above and in my Opinion on preliminary approval, it does not appear that there was much risk that a court would not find that the central question which survived the motion to dismiss, namely whether Defendants engaged in fraudulent representations which artificially inflated the price of Gilat stock, predominated over the individual claims of each class member.

(4) Quality of Representation

"To determine the 'quality of the representation,' courts review, among other things, the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." *Taft v. Ackermans*, 2007 WL 414493, at *10 (S.D.N.Y. 2007).

As I have previously noted, Plaintiffs' Counsel in this case are qualified and experienced in this type of litigation and their preparation and advocacy have been praised by the mediator. As for the recovery amount, the $20 million Gross Settlement Fund equals 10.6% of Plaintiffs' highest damages estimate (and a much higher percentage of more conservative damages estimates). Given the risk involved in proving liability and establishing the amount of damages, such a recovery, while perhaps not as "excellent" as counsel claims, is within the range of settlements that are common in securities class actions.

(5) Relationship of Fee to Settlement

Plaintiffs' Counsel proposes a fee of 30%, or $6 million leaving the settlement fund with $14 million before deducting other expenses.

Although counsel has cited other cases in which courts have granted a fee award of 30%,[40] "reference to awards in other cases

---

[40] *See Taft,* 2007 WL 414493 (30% fee awarded on $15 million settlement, where lodestar was $3.2 million); *Hicks v. Stanley*, 2005 WL 2757792 (S.D.N.Y. 2005) (30% fee awarded on $10 million settlement, where lodestar was $1.6

is of limited usefulness," *In re KeySpan Corp. Securities Litigation*, 2005 WL 3093399 at *13 (E.D.N.Y. 2005), because "fee awards should be assessed based on the unique circumstances of each case." *In re Bristol-Myers Squibb Securities Litigation*, 361 F.Supp.2d at 236. Moreover, "[s]ince *Goldberger*, courts in the Second Circuit have tended to award attorneys' fees in amounts considerably less than 30% of common funds in securities actions, even where there is a substantial contingency risk." *In re KeySpan Corp. Securities Litigation*, 2005 WL 3093399 at *12 (internal quotations omitted) (citing cases); *see In re Twinlab Corp. Securities Litigation*, 187 F.Supp.2d 80, 88 (E.D.N.Y. 2003) (Awarding a 12% fee after finding "that a 25% fee . . . would be excessive considering that the parties did not engage in extensive discovery, motion practice, trial or appeals and that the action was settled shortly after the motions to dismiss were decided."). In the present case, although the case was complicated and required counsel to encounter some risk, a 30% fee, which is at the high range of what courts award, is not

---

million); *Schnall v. Annuity and Life Re (Holdings), Ltd., et al*, 02-CV-2133 (January 21, 2005) (Awardeing a fee of 33 1/3 % on $16.5 million settlement, where loadstar was $1.8 million). However, two cases cited by counsel are distinguishable since the fee awarded under the percentage method was less than the lodestar amount. *See In re Blech Securities Litigation*, 2002 U.S. Dist. LEXIS 23170 (S.D.N.Y. 2002); *Baffa v. Donaldson Lufkin & Jenrette Securities Corp.*, 2002 U.S. Dist. LEXIS 10732 (S.D.N.Y. 2002). Another case cited by plaintiffs, *In re ESC Medical Systems Ltd. Securities Litigation*, 98-CV-7530 (April 1, 2002) contains no explanation of the reason the fee was awarded or what the loadstar would have been. The remaining cases cited by plaintiff were decided pre-*Goldberger*. *See In re Medical X-Ray Film Antitrust Litigation*, 1998 WL 661515 (E.D.N.Y. 1998); *In re Warner Communications Securities Litigation,* 618 F.Supp. 735 (S.D.N.Y. 1985).

mandated by the nature of the claims and the process of the litigation.[41]

## (6) Public Policy

"Public policy concerns favor the award of reasonable attorneys' fees in class action securities litigation." *In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation,* 2007 WL 313474 at *21; *see also In re WorldCom, Inc. Securities Litigation*, 388 F.Supp.2d 319, 359 (S.D.N.Y. 2005) ("In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives."); *In re VisaCheck/Mastermoney Litigation*, 297 F.Supp.2d at 524 ("The fees awarded must be reasonable, but they must also serve as an inducement for lawyers to make similar efforts in the future."). However, "[a]n award of fees in excess of that required to encourage class litigation . . . does not necessarily serve public policy." *In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation,* 2007 WL 313474 at *21

---

[41] Given the modest size of the total settlement, I am not concerned that a 30% fee would constitute a windfall for counsel. *See In re Indep. Energy Holdings PLC*, 2003 WL 22244676, at *6 (S.D.N.Y. 2003) ("[T]he percentage used in calculating any given fee award must follow a sliding-scale and must bear an inverse relationship to the amount of the settlement. Otherwise, those law firms who obtain huge settlements, whether by happenstance or skill, will be over-compensated to the detriment of the class members they represent.").

(finding the public policy did not require an award of 28% of the settlement fund, which would be an "exceedingly high rate of compensation."); *but see In re Sterling Foster & Co., Inc.,* 2006 WL 3193744 at *8 ("The 25% contingent fee is a fair and reasonable fee and follows the emerging trend within the Second Circuit in securities class actions."). In the present case, while public policy does favor a significant fee award to Plaintiffs' Counsel, to compensate them both for their time and their risk, a fee award of 30% is not necessary to accomplish that goal.

*Cross-Check*

As noted above, the Second Circuit encourages courts applying the percentage method to "cross-check" against the lodestar amount to establish a baseline for reasonableness. "Of course, where used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court. Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case (as well as encouraged by the strictures of Rule 11)." *Goldberger*, 209 F.3d at 50.

In the present case, Plaintiffs' Counsel has worked approximately 9,958 hours on this action which, applying their normally hourly rates, yields a lodestar amount of

$4,641,785.95.[42] Billing records show a range of rates charged by Plaintiffs' Counsel, starting at $325 for associates[43] and up to $725 for certain partners. While these fees are high, they are not out of line with the rates of major law firms engaged in this type of litigation.[44] *See In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation,* 2007 WL 313474 at *22 (Hourly rates of $515/hour for associates and up to $850/hour for partners, "though high, are not inordinate for top-caliber New York law firms."); *In re NTL Inc. Securities Litigation,* 2007 WL 1294377 at *8 (approving rates up to $695 for partners); *but see In re KeySpan Corp. Securities Litigation*, 2005 WL 3093399 at *15 (Finding that, in 2005, a firm which charged from $350/hour for associates and up to $675/hour for partners was on the higher end for securities class action suits and that $550/hour for senior associates was "beyond [the] prevailing rate."). Though partners in these firms, who bill at the highest rates, did spend significant time on these cases, it does not appear that the

---

[42] "Current 'market rates' are proper because such rates more adequately compensate for inflation and loss of use of funds." *Stanley*, 2005 WL 2757792, at *10 (citing *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989)).

[43] A single "of counsel" attorney who worked for less than 13 hours on the case for Bernstein Liebhard was billed at a rate of $185/hour.

[44] Bernstein Liebhard, and Cohen, Milstein are based in New York City, while Glancy Binkow is based in Los Angeles. At Bernstein Liebhard, partners involved in the case charge up to $725/hour and associates charge up to $525/hour. At Cohen, Milstein partners involved in the case charge up to $675/hour and associates charge up to $325/hour. At Glancy Binkow partners involved in the case charge up to $625/hour and associates charge up to $525/hour. The Law Office of Jacob Sabo charged a rate of $395/hour for the work of Mr. Sabo, which he states is his normal billing rate.

firms relied primarily or inappropriately on partners to do work more properly performed by more junior members of the firm.[45][46]

"Under the lodestar method of fee computation, a multiplier is typically applied to the lodestar. The multiplier represents the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors." *In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation,* 2007 WL 313474 at *22. The $6 million fee requested here represents a multiplier of just under 1.3. "In this Circuit, contingency fees of 1.85 times the lodestar and greater have been deemed reasonable by the courts." *Hicks v. Stanley*, 2005 WL 2757792, at *10 (S.D.N.Y. 2005); *see In re Interpublic Securities*, 2004 WL 2397190, at *12 (S.D.N.Y. 2004) (approving 12% fee representing multiplier of 3.96 times

---

[45] At Bernstein Liebhard, 30% of the time was spent by one associate, at a rate of $495/hour, and partners account for less than 50% of the time. At Cohen, Milstein, partners account for approximately 50% of the total hours spent by attorneys and paralegals. At Glancy Binkow, partners (and "of-counsel" billing at partner rates) account for just under 50% of the total hours spent by attorneys and paralegals. The exception is that Mr. Sabo, who is a solo practitioner, personally performed all the work at his firm.

[46] That said, the paralegal rates at Bernstein Liebhard, which were routinely above $200/hour and reach $250/hour, and Glancy Binkow, which start at $255/hour and reach $275, do appear to be above prevailing market norms. *See In re KeySpan Corp. Securities Litigation*, 2005 WL 3093399 at *15 (Paralegal rate of $215/hour and 'law clerk' rate of $275/hour are "excessive."). However, the total lodestar for paralegal work at these two firms was, based on this Court's best estimate from the data provided, approximately $188,000, or just 4% of the total lodestar, and so, to the degree the rates were excessive, their impact on the lodestar is minimal.
    It was not immediately clear from the submissions of Bernstein Liebhard which employees who worked on this case were attorneys and which employees were paralegals or law clerks. However, by looking at the firm's internet site, I was able to identify the names of attorneys at the firm and, by process of elimination, determine which listed employees were paralegals or law clerks. *See* http://www.bernlieb.com/ (last visited on July 20, 2007).

lodestar) (internal citation and quotation omitted); *In re Arakis Energy Corp. Securities Litigation*, 2001 WL 1590512, at *15 (E.D.N.Y. 2001) (Multiplier of 1.2 would not "deviate materially from post-*Goldberger* decisions of courts within the Second Circuit."). Though greater and lesser multipliers have been applied, a 1.3 multiplier is not out of line with other cases recently decided in this circuit.

Finally, in performing this cross-check, the Court typically "confirm that the percentage amount does not award counsel an exorbitant hourly rate." *In re Bristol-Meyers Squibb Securities Litigation*, 361 F.Supp.2d at 233. In the present case, the average hourly rate, based on the hours work and the $6 million fee, would be $602/hour for all personnel. While that amount is significant, it does not appear to be exorbitant. See *In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation,* 2007 WL 313474 at *22 (Finding effective rate of $1,193.51/hour to be "exorbitant.").

Balancing all these factors, and accounting for the lodestar calculation, it appears to the undersigned that this case does not merit an award at the very high-end of fees given out by courts in this circuit, but does merit a significant award of 25% ($5 million), which adequately compensates Plaintiffs' Counsel

for their time, effort and risk.[47]


## B. Expenses

Plaintiffs' Counsel also requests reimbursement for out-of-pocket expenses totaling $588,810.43, below the $600,000 estimate in the Amended Notice. These expenses include both standard office expenses, travel and the expenses incurred in consulting fees for Plaintiffs' experts and investigators. The expenses are broken down as follows: Bernstein Liebhard spent $54,523.56, Cohen, Milstein spent $98,852.67, Glancy Binkow spent $337,770.20, and the Law Office of Jacob Sabo spent $87,664. Lead Plaintiffs also incurred expenses of $10,000.

"Courts routinely grant the expense requests of class counsel." *In re KeySpan Corp. Securities Litigation*, 2005 WL 3093399 at *18; *see In re Arakis Energy Corp. Securities Litigation*, 2001 WL 1590512 at *17 n.12 ("Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course."). However, while "nit-picking" is not required, it is still the responsibility of the district court to

---

[47] I am not concerned that this represents a multiplier of less than 1.1 since the hourly rates charged by these firms, which establish the lodestar baseline, are at the very top-end of rates charged by similar firms and, accordingly, compensate counsel for their risk. *See, e.g., In re KeySpan Corp. Securities Litigation*, 2005 WL 3093399, at *16 (E.D.N.Y. 2005) ("[T]he use of rates which are higher than reasonable serves to meet the concerns of Class Counsel that they will be properly compensated for value lost due to the contingent nature of the fee arrangement and for the risk associated with this litigation, and alleviates the necessity of the application of a heightened multiplier.") (internal quotations omitted).

review the expenses and address any concerns. *In re KeySpan Corp. Securities Litigation*, 2005 WL 3093399 at *18.

*Plaintiffs' Counsels' Expenses*

At the request of the undersigned, counsel has provided some additional detail under seal as to the cost of consultants and experts, which account for approximately $285,000 of the total expenses.

After reviewing the information submitted by counsel, the rates for experts and consultants appear reasonable given the expertise involved, as does the total amount spent on these services. *See In re Ashanti Goldfields Securities Litigation,* 2005 WL 3050284, at *5 (E.D.N.Y. 2005) ("By far the largest expense, totaling over $500,000, was for the services of expert witnesses . . . . This is not unusual in securities litigation actions.") (internal citations omitted). In addition, the remaining office, travel and research expenses also appear fair and reasonable and, accordingly, the motion for Plaintiffs' Counsels' expenses is granted.

*Lead Plaintiffs' Expenses*

At the request of the undersigned, counsel has submitted a translated copy of Lead Plaintiffs' description of their $10,000 in expenses. Lead Plaintiffs spent 25 hours, at a rate of

$300/hour, managing the case; 10 hours, at a rate of $100/hour,
performing economic analysis; 20 hours, at a rate of $50/hour,
providing audit services; and also spent another $500 in computer
expenses.  Lead Plaintiffs also filed, under seal, an affidavit
which lists the tasks performed by Lead Plaintiffs and the basis
for the hourly rates listed.  "Courts in this Circuit routinely
award such costs and expenses both to reimburse the named
plaintiffs for expenses incurred through their involvement with
the action and lost wages, as well as to provide an incentive for
such plaintiffs to remain involved in the litigation and to incur
such expenses in the first place." *Hicks*, 2005 WL 2757792, at
*10.[48]  Since the tasks undertaken by employees of Lead
Plaintiffs reduced the amount of time those employees would have
spent on other work and these tasks and rates appear reasonable
to the furtherance of the litigation, the motion for $10,000 in
expenses for Lead Plaintiffs is granted.[49]

---

[48] Under the PSLRA, the share of any final judgment "awarded to a
[class] representative . . . shall be equal, on a per share basis, to" the
amount awarded to all other members of the class but "[n]othing in this
paragraph shall be construed to limit the award of reasonable costs and
expenses (including lost wages) directly related to the representation of the
class to any representative party." 15 U.S.C. § 78u-4(a)(4).

[49] The "computer expenses" are presumably out-of-pocket costs which are
also reimbursable.

    While Plaintiffs' Counsel disclosed their intent to move for fees and
expenses in the Notice, Lead Plaintiffs first made their request for
reimbursement along with motion for fees and expenses filed by Plaintiffs'
Counsel.  Since Class Members had no prior notice of Lead Plaintiffs'
intention to make such a request, I entertained objections to such expenses
until September 3, 2007, the date for filing of Proof of Claim forms.  No such
objections have been filed.

II. Liban Fee Request[50]

In a brief submitted July 3, 2007, Imanuel Liban filed an

"objection to the fee component" of the Settlement Agreement.[51]

According to Mr. Liban, he is a Class Member under the terms of

the Settlement Agreement, and on April 15, 2002, filed a suit

against defendants[52] in the District Court of Tel Aviv, as well

as an application to recognize his suit as a class action,

specifying as the class all those who purchased Gilat shares

between May 16, 2000 and October 2, 2001.[53]  According to Mr.

Liban, the Tel Aviv suit "concerns the false and misleading

nature of the quarterly financial statement publications of Gilat

for the year 2000 and for the first two quarters of the year

2001" which resulted in Gilat shares being traded at an

"exaggerated artificial price."  Following the filing of Mr.

_____

[50] Although Mr. Liban's papers are labeled as an "objection," Mr. Liban does not object to the settlement itself or to the awarding of the requested fees to Lead Counsel.  Rather, he only seeks an additional award of fees for his efforts.

[51] Mr. Liban also served notice that his attorneys would appear at the Fairness Hearing.  However, no one appeared on that date.  Mr. Liban and his lawyers later apologized for their absence, stating the absence was due to personal reasons of Mr. Liban's lawyers.  Clarification on Behalf of Mr. Liban, filed August 20, 2007, ¶ 1.

[52] Mr. Liban's suit also named Gilat's auditors, Kost, Fuhrer and Gabai - Ernst Young, but the claims against them have been "deleted" according to Mr. Liban.

[53] A copy of the filing papers have not been provided to this Court. This litigation was originally filed in this district on March 11, 2002, a week before Mr. Liban's attorneys began working on the case on March 18, 2002 and a month before Mr. Liban actually filed his suit in Israel.

Liban's claim, defendants applied for a stay of proceedings[54] and on October 10, 2002, the Tel Aviv District Court ordered the proceedings stayed until "the granting of a judgment or other operative rulings from the appropriate Court in the USA."[55]

Mr. Liban now argues that his attorneys should be awarded fees and he should be reimbursed for the expenses he incurred in filing the suit in Tel Aviv since his claim materially advanced the settlement of the matter.[56] According to Mr. Liban, while American law requires proof of scienter to establish liability for this type of securities fraud, a plaintiff need only demonstrate negligence before an Israeli court and, accordingly, even if an American court found that there was no scienter, the case could have been revived in Tel Aviv under the more plaintiff-friendly Israeli law.[57] Mr. Liban argues that it is "self-evident" that Defendants took this factor into account and that it played an important part in motivating Defendants to

---

[54] Mr. Liban states that he submitted a reply to that application, in which he apparently objected to the stay.

[55] *Gilat Satellite Networks Ltd. v. Emanuel Liban*, No. A 1456/02, slip op. at 6 (Dist. Ct. of Tel Aviv, Oct. 10, 2002). Although Mr. Liban did not provide a copy of the Tel Aviv court's decision, Lead Counsel has provided me with a certified translation (attached as Exhibit 2 to Lead Plaintiffs' Response to the Clarification on Behalf of Mr. Imanuel Liban, Docket # 136).

[56] Mr. Liban request attorneys fees of $110,302.50 and reimbursement of $15,000 in expenses. According to the documents provided by Mr. Liban, his attorneys spent 382 hours preparing the claim and preparing a reply to the application for a stay. No documentation has been provided for Mr. Liban's expenses, which he says are for translation of documents, accounting and financial consultation, photocopying and binding.

[57] Though Mr. Liban provided no proof that Israeli law requires only a finding of negligence, Mr. Sabo confirmed that to be the case.

settle the action.

A district court is authorized to provide "compensation for attorneys' fees and expenses where a proper showing has been made that the settlement was improved as a result of [applicant's] efforts."[58] *White v. Auerbach*, 500 F.2d 822, 828 (2d Cir. 1974). In this case, Mr. Liban's application revolves around his claim that Defendants were motivated to settle at least in part by the possibility of an Israeli court applying the more plaintiff-friendly Israeli law. However, in its decision staying the proceedings, the Tel Aviv court found that "the relevant law for the action . . . is American law" since the contract was signed in New York and because the securities were purchased "based on expectations and reliance on the American Securities Laws."[59] Given this determination as to choice of law, Defendants had little to be concerned about the possible application of Israeli

---

[58] While the Court in *White* was specifically discussing fees for objectors, I see no material difference between objectors and others whose efforts in the period prior to the appointment of lead counsel improved the settlement. *See In re Auction Houses Antitrust Litig.*, 2001 WL 210697, at *4 (S.D.N.Y. 2001) (denying fee application where attorneys "jumped on the band wagon" and filed complaints, since "the mere filing of complaints did not benefit the class."); *In re Cendant Corp. Securities Litigation*, 404 F.3d 173, 195 (3d Cir. 2005) ("If an attorney creates a substantial benefit for the class [in the period prior to the appointment of lead counsel] - by, for example, discovering wrongdoing through his or her own investigation, or by developing legal theories that are ultimately used by lead counsel in prosecuting the class action - then he or she will be entitled to compensation whether or not chosen as lead counsel.").

[59] *Gilat Satellite Networks, Ltd. v. Emanuel Liban*, No. A 1456/02, slip op. at 4 (Dist. Ct. Of Tel-Aviv, Oct. 10, 2002); *see also* Declaration of Jacob Sabo, ¶ 4. Even if the court in Tel Aviv was merely indicating how it was likely to rule on choice of law, rather than actually making a ruling, it is clear that Defendants had little to be concerned about regarding the application of the more lenient Israeli law.

law, and, accordingly, the filing of Mr. Liban's suit cannot be said to have materially advanced the settlement.[60]  Moreover, while Mr. Liban claims that it is "self-evident" that his suit induced the settlement, there is nothing in the record which indicates that Defendants took the Israeli action into account at any point.  In fact, Mr. Liban did not participate in the settlement discussions nor did he apply to be a Lead Plaintiff.  Though Mr. Liban filed a "Clarification On Behalf of Mr. Imanuel Liban" (the "Clarification"), on August 20, 2007, the Clarification contains nothing more than the rehashing of Mr. Liban's conclusory claims that the Israeli proceedings "acted as a catalyst, encouraging the defendants in the United States" to settle.[61]  A conclusory allegation unsupported by the record is an insufficient basis on which to award fees which would reduce the settlement fund available to the Class.

While it was unclear from Mr. Liban's initial filing whether he also implicitly requested exclusion from the Class,[62] Mr. Liban states in his Clarification that, "**he does not intend to withdraw from the class**" (emphasis in original).  I find that Mr.

---

[60] At the Fairness Hearing, Defendants' counsel confirmed that they were aware of the Israeli action but that such knowledge did not factor into their determination as to the amount of the settlement.

[61] Clarification, ¶ 12.

[62] At the Fairness Hearing, I directed counsel for the parties to contact Mr. Liban and instruct him to inform me whether he was indeed seeking exclusion, which they did by hand-delivered letter to Mr. Liban's attorneys on July 26, 2007.  The Clarification was sent in response.

Liban has not requested exclusion from the Class, nor is he entitled to attorneys fees or expenses.

### Conclusion

For the reasons set forth above, the parties' motion for final approval of the Settlement Agreement is granted, Lead Counsel's motion for attorney's fees and expenses is granted in part and denied in part, and Imanuel Liban's motion for attorney's fees and expenses is denied. The Clerk is directed to transmit a copy of the within to all parties and to Chief Magistrate Judge Gold.

SO ORDERED.

Dated :   Brooklyn, New York
          September 18, 2007


                    By: /s/ Charles P. Sifton (electronically signed)
                         United States District Judge